LaTeach ...   Anderson Jawato

In Pro-Per
            Plaintiff

vs.

City of Vallejo ET AL
            Defendants

CASE
   2:04 CV-00163-WBS-GGH

To THE Honorable Judge Hollow

# FILED

APR - 5 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

Important documents
To Support UNKNOWN
        Judgement

Attorney did not have or tried to protect Plaintiff
Case without presenting attached documents

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **LATEACHEEAH ANDERSON-SALVATTO** ) | **Case No.: 2:04-CV-0016-WBS-GGH** |
| **AND RICHARD SALVATTO** ) | **DECLARATION OF** |
| ) | **LATEACHEEAH ANDERSON-SALVATTO** |
| **PLAINTIFFS,** ) | **AND RICHARD SALVATTO TO SET** |
| ) | **ASIDE MOTION OF SUMMARY JUDGEMENT** |
| **VS.** ) | **ORDER TO DISMISS AND SUPPORTING** |
| ) | **DOCUMENTS** |
| **CITY OF VALLEJO, ET. AL.** ) | |
| ) | |
| **DEFENDANTS** | |

**TO ALL OF THE ABOVE CAPTIONED DEFENDANTS AND TO THE ABOVE TITLED COURT:**

**WE, LATEACHEEAH ANDERSON-SALVATTO AND RICHARD SALVATTO, PLAINTIFFS IN THE**

**ABOVE TITLED MATTER DECLARE AS FOLLOWS:**

We request that the order of summary judgment to dismiss our case to be set aside.

We have attempted, in good faith, to comply with all discovery and or pre-trial scheduling requests and will in good faith to comply with all future requests.

We feel that we have been wronged and wish to have our day in court, having suffered through this matter since January 5, 2003.

We do not feel that we have been represented properly by counsel.

We believe that our counsel, Jeffery Fletcher, caused a motion for summary judgment to dismiss to be filed against our complaint due to his inaction.

1

We believe that counsel's unprofessional conduct, immoral and unethical procedures violated the code of professional Responsibility.

We believe that there is ample amount of evidence to corroborate my claims that can be gathered and produced if the proper effort is made.

We believe that counsel's misconduct as an officer of the court should not prevent our pursuit of justice

We believe that counsel's conduct can be made subject to disciplinary sanction and not only the plaintiff suffers and made unable to pursue or recover from the complaint filed and have thier day in court.

We declare, under the penalty of perjury that the forgoing is true and correct, executed on April 5, 2007, under the laws of the State of California and the United Sates, in the County of Solano, Sate of California

Date: 4 - 05 - 07

LaTeacheeah Anderson-Salvatto

Date: 4 - 5 - 07

Richard Salvatto

2

LaTeacheeah G. Salvatto
1114 Vervais Avenue
Vallejo, CA 94591

April 5, 2007

William B. Shubb
Judge
California Eastern District Court
4-200 Robert T. Matsui
United States Courthouse
501 I Street
Sacramento, CA 95814-7300

Re: 2:04-cv-00163-WBS-GGH
Salvatto vs. City of Vallejo

Your Honor,

It has come just to our attention, after contacting the clerk of the court, that a motion to dismiss
this case has been granted. I would like you to review the matter. It is unfair that our claim be
dismissed when we have made every effort and spent thousands of dollars in order to comply
with all court rules. I do not believe that our attorney, Jeffery Fletcher, had any intentions of
properly representing our case but only to defraud us out of our money.

I have never witnessed such a miscarriage of Justice before dealing with my case and the
actions, or inactions, of my attorney. I was unaware of the missed deadlines of pre-trial
scheduling as well as the defendants filing for summary judgment or the legality thereof.

I throw myself on the mercy of the court. Our attorney has lied to us regarding all matters of the
case.

You should also be aware that there are other cases of misconduct against Mr. Fletcher
currently being pursued by other clients of his. I believe that Jeffery Fletcher has not sufficiently
represented all of the facts of this case and I have been trying for months in vain to get any
clear indication from him of the status of the case or why the case has reached this critical point.

I believe that he should be disciplined not my case. I dealt with Mr. Fletcher and the court in
good faith. It was Mr. Fletcher who did not respect the courts rules and conducted himself in
such an outrageous and unprofessional manner. Please refer to document 47 flied December
13, 2006 by defendants. Your order to dismiss this case was dated March 27, 2007. I have tried
to make contact with Mr. Fletcher as he has not formally notified me that the case was
dismissed, instead he has just made requests for additional money.

I have attached a copy of a letter to my attorney to show that I have tried to maintain some
measure of influence over my case but I have been frustrated in that attempt. I would hate to
think that this case would be dismissed because it had not been pursued as forcefully as it
deserves. This is not what seeking justice should be about. I paid him to represent me, he
simply just took my money. I have enclosed documents which I feel should enlighten the court
as to the inadequate and unprofessional conduct I have endured at the hands of Mr. Fletcher

I still can not believe why a person such as myself could have been arrested when I was only
trying to assert my constitutional rights to file a complaint against a police officer. I have been a

businesswoman in Vallejo for years and ran for mayor of the city several years ago. I have standing in the community. I can only feel that I was treated in this way because I am a black woman. I feel I deserve my day in court to make my case. I have substantial support for my position from an expert witness that my arrest was clearly unjustifiable on any grounds. He points out that the most simple solution available to the police at the time was to allow me to file my complaint and that would have resolved the situation.

Instead the police refused to entertain any meaningful communication with me and ignored my repeated requests to be allowed my rights to file a complaint. I can only assume that the police wanted to prohibit any such complaint as they knew they were in the wrong. My arrest was a way for them to terminate what they saw as a threat.

I humbly request that you set aside the motion to dismiss and allow me the opportunity of my day in court

Sincerely,

Copy: The Honorable Gregory G. Hollows
      Magistrate Judge

Incident at Vallejo Police Headquarters
Sunday January 5, 2003

Affirmed Statement of:
LaTeacheeah G. Anderson Salvatto

Lateacheeah G. Salvatto
1114 Vervais Avenue
Vallejo, CA 94591
707-648-0635
email: rsalvatto@aol.com

Incident at Vallejo Police Headquarters
Sunday January 5, 2003

My name is LaTeacheeah Anderson Salvatto. I was born in Vallejo and have lived here for more than 40 years. I am married with two children of my own and I care for 5 others in my home as either a foster parent or guardian. My husband is a Vice President of a major bay area corporation. I have owned and managed businesses within this city employing over thirty people. Three years ago I ran for Mayor; I am, what most people would call, a solid citizen. I mention this because the following story is so bizarre, so out of date with modern society that I would not want anyone to think I was a homeless bag lady in rags – who even then would not warrant the kind of treatment I received at the hands of the Vallejo Police Department.

When I ran in the last mayoral election for this city, one question asked of all the candidates was: "The city of Vallejo claims the police department needs to hire more officers to do a better job, do you think Vallejo needs to hire more police officers'? I replied, "If the department re-trained the police officers they all ready have to do their job properly it would appear that Vallejo had hired new police officers". My assessment of the Vallejo police department then and now is the same.

## WHY DID I GO TO THE POLICE STATION?

I am the guardian for Jamal Thrower who is 16 years old and living in my home; he is treated like a son. Jamal returned home upset and crying as a concerned parent I asked him what was wrong. He said, "I got a ticket riding the scooter." I told him it really wasn't a big deal, don't worry about it; but my words did not seem to help. "They arrested me put me in hand cuffs and everything. I asked them could I call home and they wouldn't let me" My four children whom are under the age of 10 were seated having dinner as well several other teenagers. One of the children asked "why the police did that to Jamal"? The other one said, "mommy you said the police are suppose to help us". One of my foster children yelled out " that's why my daddy hate the cops they always want to take blacks to jail, isn't that true mommy?" "Hey! what did I tell you? We do not refer to police officer as cops in this house. Look, if you guys ever need help you look for a police, they are here to help us when we need help. But sometimes the police make mistakes. I decided that it would be best to continue the conversation with Jamal in another room.

Jamal stated that he had been arrested and taken to the police station, fingerprinted as well as having his photo taken. I asked what the officer said to him when he stopped him? He said the officer mentioned that a police incident of some sort had occurred a few blocks away earlier that day. What that meant and what it had to do with Jamal I don't know. I calmed Jamal down and discussed the issue with my husband.

My husband and I were both concerned as to why Jamal's request to telephone home was denied. We were under the impression that the law is clear regarding the treatment of a minor while they are in police custody. Our basic assumption was: The police must notify a minor(s) parent or

guardian immediately and they should make every effort to contact a parent or guardian immediately. It was decided that in the best interest of our family one of us was obligated to go down to the police station and sort out what took place. I personally was looking forward to telling the kids that everything is fine and always trust the police. I refused to leave them with a negative impression about the police; it conflicted with all that I have taught them. Leaving my children in a state of confusion about the police was not an option. Such confusion could be detrimental to their development.

## WHAT HAPPENED AT THE POLICE STATION?

It was dusk when Jamal and I arrived at the police station. To my surprise the station was closed. I peered through the window and read the hours 7am to 7pm. Jamal said, "I think you have to use this white phone". I pick up the telephone a lady who referred to herself as Mary answered and asked how could she help me. I explained to her that a police officer arrested a kid on Springs Road about an hour ago. Mary interrupted and asked what's the name? I replied Jamal Thrower. Mary said, "The officer is on his way in" and hung up. I looked at the telephone and hung it up. Again I peered through the glass wondering why the main police station is actually closed, it was not yet 7pm.

The sunlight has completely disappeared, the wind seem to cut right through the leather coat I was wearing. I thought about my big thick weather resistant suede jacket. A car passed and people yelled obscenities and threw something from their car toward the station. I immediately ran to the telephone and picked it up, Mary was on the line. I asked if we could wait in the lobby and told her that not is it only cold out here but you have people passing yelling obscenities and throwing things at the station. She stated that the lobby was closed. I said, "it's not safe for any one to be out here and it's cold can't we wait in a room, I'm sure there is somewhere we can wait other than out here". "Well the lobby is closed" Mary replied. "The sign reads open 7am to 7pm," I said. Mary interrupted me and stated "Yeah well that's through the week days, weekends and holiday we're closed". I asked, " This is police station, what do you mean you're closed?" Mary replied with an audible sigh then stated, "I'll check with the watch commander", and hung up.

More time elapsed; a man drinking from a bottle partially wrapped with a brown bag stumbled by using a couple of the station steps as his pathway. Fear has a way to bringing reality into check. I could not believe that I live in a city of over a hundred thousand people and the main police station was closed. I'm standing here freezing and afraid. Again I picked up the telephone as I commented to Jamal what a shame that a tax paying citizen or any citizen for that matter could feel so unsafe waiting in front of their police station. Mary answered. I stated "hey I'm still out here in the cold, waiting, it's really not safe out here...Mary interrupted "look you don't have to keep calling back here every two seconds! I told you I would let the watch commander know!" and hung up the telephone.

I picked up the telephone again and ask, "Why are you speaking to me like"... Mary abruptly hangs up. I pick the telephone up again I get a busy signal, I hang up and pick the telephone up again and ask, "Why are you hanging up?" but before I could finish asking the question Mary has already hung up the telephone. I picked up the telephone again and get a busy signal. This

cycle repeated itself at least 3 times before I gave up. I wanted to breakdown and cry but I can't because Jamal is already upset. I believe he was embarrassed for having to witness someone he believes in and respect treated so disrespectful. Very few words were spoken between us; we just mostly shook our heads in disbelief. My soul began to feel bad, a rotten feeling settled in the pit of my stomach.

More time passed and finally two officers appeared and the sliding glass doors opened. I immediately stepped into the building, breathing into my hands as I rubbed them together trying to warm. A thickset man who identified himself as the watch commander spoke first, "Ah what can we do for you?" From this one sentence, I some how knew this was not a peace officer. I ignored the man's tone and decided to act in the positive. "Hi! My name is LaTeacheeah Salvatto, I'm here because Jamal was stopped by one of your police officers and I would like to talk to him about what happened. The lady on the phone said he's on the way. I would like to wait inside"…the watch commander looked at the other officer then abruptly interrupted me, " Look you've been told that the lobby is closed, you keep picking up the phone". I interrupted "Hold on, hold on you don't have to talk to me like that, what's the problem? I'm just a mother, coming to check on a kid. Not only is it cold out there, but do you guy's realize that a citizens would have a better chance of getting help from one of the houses around here before they would get help from the police. All I'm asking is that you let us wait here inside", again the watch commander interrupts, "The lobby is closed you need to step out". I understood at this exact moment as far as the commander was concerned my being at the police station was no longer about Jamal.

In an instant the entire issue and conversation was simply about me being in the lobby, as if I've been standing in the lobby for 3 or 4 days. My mind was shocked by the dialog and attitude of this commander. The commander's demeanor was shameful, I had to remember, nothing truly valuable arises from ambition or from a mere sense of duty; it stems rather from love and devotion towards men and toward objective things. Then I thought of Trent Lott. " I know that you guys have made that abundantly clear, but surely there is an office available". " You need to step outside" the commander insisted and again looked at the other officer, the other officer stepped toward me and pushed me toward the door with his elbow. I put my hands up and motioned to the officer to stop, I was afraid and I told him. "Please officer you don't have a right to touch me, if I did that to you; you would charge me with assault. Will you please step back you're scarring me. I didn't do anything I don't understand why you guys are treating me this way. This is a police department, you're police officers. People are driving by yelling obscenities and throwing thing out of their cars, drunks are wondering by (at that very moment a man staggered by). Look it's dangerous and I'm afraid, it's not safe to stand out there. I know there is a room where we can wait". The commander shouted out " Yeah I gotta room, a holding cell room and that's where I'm going to put you in a minute".

The other officer said "or maybe you need to be somewhere else, you maybe a danger to yourself maybe you can't take care of yourself". These words really scared me. If my memory served me correctly this officer just threatened to commit me to a mental institution for a minimum of 72 hours for a mental evaluation. After the evaluation the institution has the option to hold you for an additional 10 days. This is an involuntarily commitment, meaning my husband or I would be not able to sign me out during the entire 13 day period. Wow! Wow! This is real; this officer

really has the power to do this to me under the disguise of safety code 51-50. It's not so much being prejudiced, I mean I could not care less if this same man who is standing in front of me owned the hamburger joint down the road. As long as I do not enter his business there is an overwhelming possibility that his prejudice will not affect me. The fact that he his a police officer shed a different light on the situation. This person is a prejudiced police officer with authority. Prejudice plus authority is the epitome of discrimination. Moreover, illegal intuitional discriminatory practices are reproduced through the personification of these avenues. I then thought these are the same tactics used by the Nazi Gestapo.

"What are you trying to say; you're going to 51-50 me? This is absolutely ridiculous; I pay 68 thousand dollars a year in taxes to get treated like this"? The commander shouted out "Yeah right so do I." I ignored his insinuation that I'm lying about my tax bracket and continued talking to the officer. "I'm a human being why are you guys treating me like I'm an animal? Why do I have to beg to come inside my local police department to take care of official police business? Please will you just find us a place where we can wait"? Other officers began peaking into the lobby, one officer entered into the lobby with a tape recorder, after a moment the area was clear. "It's not safe to stand out there". Once again the commander spouts, "Look I'm tired of talking to you, you either leave this lobby now or I'm going to arrest you". "Arrest me? You're going to arrest me? For what?" "Trespassing" he bellowed. "Trespassing? How does coming to a police station, trying to handle police business make me a trespasser? You're the police, I'm afraid to stand out side because cars are passing yelling obscenities and throwing things, drunks are walking by. No, I'm not waiting out there".

The commander looked at the officer and before I knew it the officer moved toward me and began trying to push me out the door. "Hey what are you doing? You don't have the right to hurt me". My feet were planted somewhat firmly; the officer noticed this and moved in closer and places his knee upon the side of my thigh and kick my right foot with his shoe/boot. I was knocked off balance and the officer continued to push me out of the building. Tears were in my voice but I could not let them see me cry, the commander said, "Now if you keep it up I'm going to arrest you" "Why do you want to arrest me?" The other officer spouted out "I guess it's the season". They both backed up and the automatic doors closes as they stood smiling.

Jamal and I said simultaneously "It's the season". I said to Jamal "You know what he meant by that?" Jamal responded, "Who wouldn't, it's the season for arresting niggas", we both shook our head. Jamal adds, "This don't seem real, it's like something you see in the movies about the South in the 1950's Why are they acting like that?"

My foot was throbbing and I just wanted to leave, I felt like I had gone through too much. I looked at Jamal and realized that I had not spoken with the officer who arrested him. Foot throbbing, it's dark, it's cold and I'm truly scared. I pick up the white telephone Mary the dispatcher from hell is on the other end. I say, "Would you let the watch commander", she hangs up the telephone. The next time I pick up the telephone the line is busy.

THE ARRIVAL OF THE OFFICER WHO ARRESTED JAMAL

The officer I wanted to see in the first place arrives and the sliding glass doors open. I walk to enter the lobby, the officer and the watch commander quickly walk toward me and let the sliding glass door close. "Can't we talk in there? This is ridiculous. Jamal is this the officer that arrested you?" Jamal nods yes. I turn to the officer, "why did you arrest him?" The officer responded immediately, "because, he did not have any ID". "He's a kid what kind of ID do you want him to carry, his birth certificate, social security card what? Forget about that, why didn't you let him call home once you arrested him and brought him to the station? He's a minor you know you're suppose to let them call home, you know it." "If you would let me talk" the office looks at Jamal, "is this your mom"? Jamal must have gestured in the affirmative, "Could you tell her shut up so I can talk?" I thought to myself you think you have so much power that you can order a kid to disrespect a parent, he turned back to me and said " No you're wrong, you don't know what you're talking about". I said, "What are you saying? You can just take any kid off the street arrest them, place them in cuffs, photo and fingerprint them. As well as deny the child the right call home, is that what you are telling me?" The officer responded, "yes". I responded, "No, no, no you're wrong and you know you're wrong, you know you're not supposed to do that." The officer quickly responded, "We can do anything we want to do". The watch commander says, "that's right and we're not talking to you any more, this conversation is over." I could not believe that this was happening! I thought this guy must be an idiot, a real idiot. : What's your name?" "Do you have a card or badge number?" Give me your name as well as the officers' name who pushed and kicked me". "My name and badge number is on the Ticket I gave your son," the arresting officer said. The watch commander gave me his card and said, "You got all the information". Both the watch commander and the officer walked away, down the pathway. I said, "It's unbelievable to think that you're the watch commander. You should take that uniform off. You are a disgrace to every virtuous police officer that wears a uniform. You should not work as a police officer and have any authority over people, your abuse of power is beyond belief." "You don't have what it takes. Where is your integrity? Take the uniform off you racist and put on your sheet and burn a cross!"

UPON RETURNING HOME

I told my husband what had happened at the station and he was stunned. He said, "The officer pushed and kicked you? That is assault plain and simple you need to file a formal complaint against that officer and right away, they can't get away with that in this day and age". I asked my husband to call the police and have them come out to the house so that I could file a formal criminal victim's assault report. I handed him the card the commander gave to me, the card read Tom Liddicoet, lieutenant, badge #379 as well as provided the telephone #(707) 649-5459. My husband went into our home office and returned a few minutes later. He said he had left a message and the officer's voice mail indicated that he checks his messages throughout his shift.

Reality hit me, tomorrow was back to school for the kids. The kids had not taken their baths, I have not washed my daughter's hair and I'm hungry. I remembered that I was to take a couple of visiting kids home and they lived on the other side of town. My husband offered to drive the kids home and I ran bath water for the boys and washed my daughter's hair. I was drying my daughter's hair when Monique, a teenager who lives in my home, brought me the telephone and

said, "It's the Vallejo police department, a lieutenant asked for Mr.Salvatto"she handed me the telephone.

"Hi, this is Mrs. Salvatto and I was assaulted by one of your police officers". For a brief second the lieutenant displayed a voice of concern, "You were? Where? When?" he asked. I was convinced in my mind that the lieutenant believed he was speaking with a woman he'd never met. I would go as far to say that I felt there was a 99.9% chance that the lieutenant for a brief moment in time thought he was speaking to a white woman as well. Those four words were as genuine as any police representative could have spoken them. The lieutenant did not associate my black face to the voice he heard in that brief but fair and nonjudgmental moment.  This often happens to me when my white husband calls and leaves a message to have his telephone call returned. A white man's voice (to make such an assumption is racist in it self; but most people engage in this subliminal racism every day), so he must have a white wife. The consciousness of racism is subliminal yet it dictates the deepest parts of our being, our mind our heart our soul. The true value of a human being is determined primarily by how he has attained liberation from the subliminal self.

"A few minutes ago you were there, you witnessed it. This is Mrs. LaTeacheeah Salvatto I just left from there". The lieutenant actually made a hideous grunt. I can only relate it to the fact that it clicked in his mind and he related the voice to the black face of the woman. From this point the conversation deteriorated, seem like the only thing the lieutenant could see is the color black again. "I want to file a criminal assault report. Would you send a police officer to my home please"? There was silence, " Look this is the least you can do, I have the right to file a report. I'm a victim of a crime you cannot deny me this right, all I need for you to do is send an officer to my home to take a report". After a few seconds he said, "Well, I'll send you a citizen complaint form through the mail" I responded "No I don't want to file a citizen complaint form. I simple want to fill out the normal criminal assault report. Will you please send an officer out"? He said in a loud angry voice "I'm not sending an officer out anywhere!" I asked, "why not? I'm a victim of a crime I want to report it. Once again he repeated himself in the same tone, "I'm not sending any one out! I said, "Okay, okay that's alright you don't have to send any one out, I'll come down. May I do that? Is that okay? Hey all I want to do is fill out the report". Before I could complete my sentence again he spouts out "I ain't sending nobody out I know that!" I instantly visualized an overweight, guy sitting back with his feet on his desk, sucking on a tooth, cleaning underneath his fingernails with an old switchblade knife. Again I ask, "May I come down there? Is it okay may I come there to fill out the report? Finally he murmurs, " yeah, I guess". My response, "great I'll be right down".

I finished drying my daughter's hair, by this time my husband had returned home.  I told him that the watch commander had returned his telephone call, and he said it was all right to come down to the police station to fill out the report because he was not going to send an officer out to the house.

This time I decided to wear the coat I was thinking about while I was standing in the cold earlier. I also thought it would be in my best interest to bring along a tape recorder. My coat has an inside pocket. I clipped the recorder on the exterior of the pocket the clipping device occupied the interior of the pocket.

## MY RETURN TO THE POLICE STATION

I parked my car in a green zone directly underneath a sign that stated 1hr-parking 7am to 7pm except on Sundays; since it was Sunday I should have no problem. I sat in my car thinking about the events that lead up to this point. This was a very sad moment for me because I am a police academy graduate. I have always held police officers in high admiration because there is one thing I know for a fact. There are very few police officers that put their uniform on for the first time and looked in the mirror and said, "I want to be a bad cop". They just turn that way. I thought about several other things then thought about me, I got out of the car, locked it and proceeded up the steps.

I picked up the white telephone, "Hi this is LaTeacheeah Salvatto I was told by the watch commander to come and fill out report he's expecting me". The lady responded, "He'll be right with you. About 3 to 4 minutes later a police officer, I had not had any contact with before appeared at the sliding glass doors. I thought great! It would be somewhat a conflict of interest to fill the report out with the commander when he is actually a witness. I was relieved that it would not be an issue. The officer immediately blocks my passage into the lobby. I could not help but notice how determined each and every officer seem to be in keeping me out of the lobby. Is this what our police have become? They have bulletproof window, armed with tear gas, ammunition, guns and an abundance of manpower and they choose to lock the public out, barricade themselves inside.

The officer had a sheet of paper in his hand. He angrily said, "Here!" I said, "No I'm, here to fill out a report. The watch commander is expecting me". The officer responded, "I'm the watch commander and you're not filling out no report, here mail this back". "No, that's not what I came down here for; I came here to fill out a criminal assault report The other commander told me to come down here to do this". The officer quickly stated, "That's not true, that's not true he didn't tell you that, you weren't even assaulted we're not filling out no report". "Who made you the judge and the jury you have no idea what happened earlier, you weren't there. What is wrong with you people? I'm a victim of an assault, I want to file a criminal assault report, this is a police station may I please file the report it will take all of 5 minutes. I have the right to file the report it's not your job to evaluate the validity. Your job is simply to fill out the report".

The officer notice the tape recorder and became upset he said, "You gotta tape... you been taping this whole conversation with out my permission, is that what you've been doing"? I looked down and honestly had forgotten I had the recorder with me. I thought to my self what an idiot, all this time you didn't even have the tape on. But the officer made me feel much better about myself as he went on ranting about his rights of all things! If the officer would have calmed down for a moment I had every intention of telling him the recorder was not on. The officer's irate behavior attracted the attention of one of the other policeman in the building. This officer immediately told the other policeman when he entered the lobby, "Be careful what you say, she's wearing a tape recorder". I thought it odd the officer did not have the presence of mind to check and see if the device was on. It is common knowledge that today recording device only record when the red indicator light is on.

I say to the officer "Hey get a hold of yourself, calm down, can we just please fill out the report"? If looks could kill I would be one dead woman that office leaned forward, squinted his eyes, stared in to my eyes, his nostrils flaring, his teeth gritting, he said in the most evil tone "We're not filling out no report here!" The officer then backed his way into the lobby and allowed the sliding glass doors to close.

I was just standing there; I'm just standing their thinking twightlight zone. I'm thinking why did the watch commander call my house and tell me to come down? What was going on? I picked up the with phone "Hi this is Lateaceeah Salvatto and I would like to speak to the watch commander I believe his first name is Tom. The lady on the other end of the line responded, " He gone for the night" I asked, "Could you ask the other watch commander to come back out I would like to speak with him"? She says, "He told me he's not going to talk to you any more". I cannot believe this. I then ask, "May I speak to the chief please"? "He's not in" the lady responded. "Yes, I know that, I would like for you to call him", I said. She said, "We are not calling the chief for something like this". This appears to me to be an exact situation to call the chief. You have a citizen who's been assaulted by a police officer; none of the on duty police officers will allow the victim of the crime to fill out an assault report. The victim requests you call the chief of the department. I would think a chief would want to be notified if every available officer on the force refuse to write a criminal report when a crime has taken place and the assault victim is standing in front of the police department pleading for any office to write the report. You do not have to be a rocket scientist to figure this one out. Who else can the victim turn to at this point?

I thought it both unbelievable as well as unfortunate those decisions to deny such request sit squarely upon the shoulders of the dispatcher. " Look lady I have been assaulted all I want to" before I complete the sentence she hang up the telephone. Oh no not this again, are this people for real? I wait a few minutes and picked the telephone up again. " My name is Mrs. Salvatto I'm a victim of an assault and I would like to report the crime. I'm right in front of your building would you please send an officer out to take the report, any officer". The lady does not respond she hangs up the telephone. I waited for a while and picked up the telephone and let the lady know that I was still out front waiting for the officer. A little while later two officers appeared at the sliding doors.

The older officer came out with his index finger pointed at me. "Look you are bothering our work, you need to leave! You been here all night bugging us, if you don't leave I'm going to arrest you for trespassing" I responded, "Officer, I did not come here to cause a problem I came here to fill out an assault report. I was told by the commander come here and fill the report out. I get down here and all I get is grief. Will you just please take the report? With a beet red face and noticeable halitosis he leaned forward. "No, we are not going to take no report. You need to leave or I'm going to arrest you". I responded, "I doubt that because that would mean you would have to fill out a report" He said, " I'm through talking to you! I'm gonna count to ten. I said, "What you're going to count to ten? Is that the professional way the academy taught you to resolve police matters? You're going to count to ten, what is that suppose to mean to me. That's something you say to a kid. Why are you talking to me like I'm a kid? You're going to count to

ten, and what happens when you get to ten? The officer arrogantly replied, "I'm going to arrest you!"

I shake my head in disbelief, and mutter to myself as I walk down the stairs to my car "I can't believe they would rather put me in jail than fill out a report". The officers followed me down to the sidewalk aside my car. I stopped and said this is unbelievable I have to call my husband. I retrieved my cellular telephone from my coat pocket. Suddenly the officer who had threatened to count to ten leaped forward grabbed my cellular and snatched the tape recorder from my inside pocket all in one move and said, "You ain't calling' nobody". For a minute I thought I was being robbed by a police officer in front of the police station. The officer began pressing and pushing buttons on the recorder. After a few minutes he says to the other officer, "Put the cuffs on her." I say, "You people have got to be living in another world." " The officer repeated the command to the other officer; "Put the cuffs on her." I got the impression that the young officer was surprised at what was going on. He appeared like he really wanted to object. A part of me just wanted that young officer to be heroic and stand with integrity and say "If you want her under arrest you do it". But obviously if the situation had deteriorated to the point of where it is now, there is very little hope that such a thing would happen. The officer placed the handcuffs on me.

As hard as I tried to stand with dignity and pride my innermost self was fragmented. I've spent 40 years of my life being a law-abiding citizen I've had one-maybe two contacts with the police in my life, guarding my freedom with care. I go to the police for help, instead they would rather lock me up than do their job. The other officer searches through my purse he stopped searching and asked, "Is this your car? He then demanded I give him the keys. I said, "You don't need the keys to my car. I did not commit a violation in my car". He responded, "Hey you're under arrest I'm going to impound your car, where's your registration". The officer then walked up to me and placed his hands in my coat pocket and retrieved my car key, unlocked my car and began searching it. I said, " You don't have to have my car towed, why are you searching my car? I can call my husband and he'll be here within 5 minutes to pick the car up. Wait a minute what are you arresting me for? Trespassing? Isn't trespassing a citable offense". "Not for you, you're going to jail" said the officer. " Look you don't have to tow my car, I have AAA they will come and remove the car. The car is not parked illegally. Why are you going out of your way to mistreat me? You know you don't have to tow my car.

It was clear to me that the only reason I was arrested and my car towed was to teach me a lesson. The police are in charge, they can do whatever they like whenever they want. They made their point, now what do I tell my children? What do I tell any of the children? My story has changed the facts are different. What am I suppose to tell my children? I am afraid, how do I teach them not to be afraid? My spirit is broken. The same broken spirit a slave might have felt after being whipped for trying to run away; caus' he didn't wanna be no slave no mo'.

TRANSPORT FROM VALLEJO POLICE DEPARTMENT TO SOLANO COUNTY JAIL

After being searched, striped of all personal items such as jewelry, writing instruments; all personal property, questioned, (They never read me my rights, by the way.) photographed and fingerprinted I was placed in a cell. When the police opened the large door I felt myself resist, I was so scared to walk across that threshold. But now was not the time to break. I knew if I made any move away from that cell these good for nothing "COPS" would add resisting arrest the charge. My heart was pounding, I laughed at the thought of me referring to the police as cops. As I crossed the threshold of the jail cell all I heard in my head was, "that's why my daddy hates the police because they always lock the black people up". How right that kid was. The large door shut and the keys triggered the sound of a click and a lock. I thought instantly that now I have become part of a statistic, another black person that has become part of the criminal justice system. I thought that the only reason I would ever end up in jail was for manslaughter. I would take a life to protect mine or my family, or any child in imminent danger. Short of that scenario freedom is everything to me, so many people died for me have it. We are in the mist of a war and the rumors of war are being talked about through out the world. Still people are dying for my freedom and democracy. I guess at some point you understand that "If you don't stand for something you'll fall for anything".

I finally lifted my head to notice that I had a cellmate. Her eyes were beautiful, she smelled of alcohol. She looked like she had seen only the rough side of the mountain. Her face was pale, with deep wrinkles. I think alcohol got the best of her it's unfortunate that people abuse themselves in such a way. My foot was throbbing, I heard the lady's tummy growl, she then commented on how hungry she was. She told me that she had been in the cell for over 7 hours and that she was starving. She told me that she asked for something to eat and they told her that they do not have any food at the police station and the that she would have to wait until she taken to the county jail before she would get anything to eat. I remembered I had some raisins in my purse. I got up and knocked on the door and got the attention of the cop who cuffed me. I said, "The lady in here says she's been here for quite sometime and she hungry" he interrupts, "Yeah well nothing I can do about that we don't have any food here". I said, "could you give me my box of raisins, I am willing to give them to her. Then I said, "I need my medicine from home, I'm suppose to take it every 4 to 6 hrs. Would you please telephone my husband and tell him to bring my medication. I really need it; look my feet are swollen, please call my husband and let him bring me my medicine, may I have the raisins? The cop smiled, shook his head, and walked away.

The large door swung open and a petit woman walked into the cell. I yelled out that I needed to make a telephone call as the slamming sound of the door echoed in my ears. The petit woman pointed to the telephone receiver in the wall, and I do mean quite literal there was a receiver of a telephone protruding from the wall, about three feet from the floor. The woman gives me instructions on how to use it. She told me to press the red button, informing me that if I release the red button the telephone call would disconnect, she told me to stoop down, listen for the dial tone because it is very faint then dial your number. She then advised me to hurry; we were about to be transported to the county jail in Fairfield.

A short while later the cell door swung open, a very large woman entered the cell, her hands were shackled to her waist. The cop called the petit woman out, leaving the door open. Within minutes she returned to the cell with her hands shackled to her waist. The cop called my name; I walked out of the cell and was instructed to hold my arms up. A chain was placed around my waist a cuffing device was used to secure my wrist to my waist. All this and they would still shoot me if I tried to escape. This is not a good experience to humiliate to dehumanize to chain me to lock me up under such circumstances is hate. If the police would have treated me like a human being none of this would have taken place. This all came about because I asked anther human being to treat me in a humane manner. Let's forget for a moment that we are talking about the police department. I had business to conduct in the building, I asked another human being to let me wait inside the build because I was frightened to wait in the dark. There must be something dangerous regarding the front of building because the entire front window is bullet proof. I spoke to at least four human beings any of which could have granted the simple request. None of them thought enough of me as a person or a human being of any being to grant my request. How would people react if black officers treated the white mother, wives, daughters, sisters or grandmothers in the manner in which I have been treated?

I was the first woman to enter the back of the white van to be transported to the county jail. If you didn't feel like animal up until this point, stepping into this van took you there. The van is totally aluminum; an aluminum wall of some sort separated the van in two. A cop kept repeating, "Women to the left men to the right, watch your head". Although I had my large coat on the aluminum was cold to sit on. Immediately the 7 other detainees started demanding heat. They had every reason to, the van was really cold. One lady commented on now we all know what it would feel like to be frozen alive. The man on the other side of the wall yelled, "You turned the air on, turn the F---in' air on. It's freezing' back here, turn the heat on you F---in' B----. This was a turning point. I had not feared for my life as much until this point. Without warning everyone started gripping about the heat. The elevation of audio level had gone from 3 to 10+ in a matter of two seconds. It was total chaos  it stayed at this level what seem to me at least a minute, maybe more. What every amount of time it was it was much more time then the female cadet officer was trained to handle. She started yelling at the top of her lungs "Shuuuuut uuuuup! Shuuuuut uuuuuup! Shuuuuut uuuuup! She began shaking her head and closing her eyes still yelling more shut ups, her facial expressions told the story as she pounded her fist on the steering will. I mean this girl really lost it I was watching her and she definitely lost professional control. I yell to the young cadet "Hey! Hey! Open your eyes! Keep your hands on the steering will. This is not how I will die, grab a hold of your self". This was the longest ride. I felt very lucky to have made it safely to Fairfield jail. I just kept visualizing the movie the fugitive the scene were the bus transporting the criminals; such we are, and they wreck. The ride scared me there was nothing I could do to save myself if this out of control, immature cadet cannot get a grip. I'm chain in the back of a locked van. I thanked the Lord for letting me arrive to the jail safely.

I was the last person out of the van, the female sheriff officer said to me "Hey I'll take you first". The shackles were taken off and I was searched again. I was lead into what appeared to be a nurse's station. A lady who spoke broken English started asking me questions regarding my

health and other personal question. At one point I told the lady that I was finish answering her questions. I had become frustrated because she acted as if she could not comprehend my answers. I told her "for get it you're writing what you want to write".

I was then taken to another holding cell. This time there were two telephones, which allowed for only collect calls to be made. I called my home and finally talked with my husband. As a matter of fact I called him several times, oddly enough when you're locked up all you want to do is talk to some one who is free. I over heard the supervisor ask "why did they bring her here? This is a cite and release offense. After a while, the sheriff removed me from the cell and placed me in private cell at the end of the hallway. The sheriff warned me as she walked me to the other cell that I should not be telling people that I am not being treated well. I knew exactly what she was talking about. My husband must have called and reported that I said that the toilet was stopped up and I needed to use it. The sheriff went on to say, "if you're good you may get out. But you can't be around here giving me no hard time". If; I am good, is that what dictates your freedom once you are incarnated at this level. The law has nothing to do with whether or not I would be freed these people have to like me. The sheriff went on to say, "Your bail is sixteen hundred dollars", I interrupted and stated, "My freedom is only worth $1,600. The sheriff then interrupted my and stated, "Well, not quite all you have to do is pay 10%. I said all this for a hundred and sixty dollars? She then asked, "If things worked out are you going to bail out"? I replied, "Pay to get out of here? You have got to be out of your mind. I wouldn't pay ten dollars to get out of here. I shouldn't be in here at all. I'm not paying a dime in a fine to get out of here. That would go against everything I believe in. I'll rot in here before I pay a penny to get out. Now if you want to let me out on my own recognizance I'll be more than happy to leave, short of that you guys need to figure out what you are going to do so I can call my husband and let him know something".

The sheriff came back in and told me that they were releasing me without bail (on my own recognizance) as should of happened in the first place. I am to appear in court Jan. 27, 2003 having been charge with violating section 602.1(B) of the penal code.

All of this was because the Vallejo police abused their power. They would not have done this if they just wanted to ticket me for a minor offense it was done with malice aforethought. They wanted to make sure I knew who had the power to make my life miserable. They wanted to intimidate me, to scare me, to terrify me. They had thought I was taping them – they wanted to get rid of any evidence of what they had done, what they were trying to cover up.

Jeffery,

LaTeacheeah called me and told me about this in general and form your email I understand the details better.

My only question has to do with the fact that I was under the impression that the $6,000 we have paid you already was supposed to cover
any expenses to do with depositions and such. Are you saying that those funds have been exhausted already? I think we need to talk about that. As far as I know
you have only done 5 or 6 depostions so far...at $500 each there should be sufficient funds to cover the expert witness. I am traveling but you can call me on my cell phone (415-359-3498) and we can discuss this.

I do not see any reason why you could not forward the papers to Mr. Dusenbury today and, if necessary, I can arrange for payment to Mr. Dusenbury.

Richard D. Salvatto  |  Director Analytic Solutions  |  Fair Isaac Corp.
200 Smith Ranch Road MS-SRN, San Rafael, CA 94903
Phone:  415-491-5187  |  Cell:  415-359-3498  |  Fax: 415-492-5691
richsalvatto@fairisaac.com

---

**From:** Jeffrey Fletcher [mailto:jefffletcher@email.com]
**Sent:** Tuesday, November 14, 2006 10:43 AM
**To:** Salvatto, Richard D (Rich)
**Subject:** expert witness retention

Mr. Salvatto:

Our opposition has retained an expert witness to testify that the arrest and detention of Mrs. Salvatto was proper. We have the right to have an expert to rebut their expert witness. I have found David A. Dusenbury, who was one of several that I have talked to. Mr. Dusenbury's web site is dwww.dusenburypolicesecurityexperts.com. I have already designated him as our retained expert. He must now review the depositions and other documents in the case and write a report by November 22, 2006. His retainer fee is $2,500, which must be paid immediately. You can refer to his web site and see his experience, fee schedule, and CV. Once you give me the OK, I will send him the documents that he needs to write the report. It needs to be Fedex'd today. If you agree to use him, we can arrange for you to send him the check directly. Of course, he will not start without the check. I look forward to hearing from you.



*Jeffrey Fletcher*
Attorney At Law

### ATTORNEY CLIENT AGRREMENT

JEFFREY FLETHCER, ATTORNEY AT LAW ("Attorney") and RICHARD
SALVATTO, LA TEACHEEAH SALVATTO, and JAMAL THROWER, a minor
("Client") hereby agree that Attorney will provide legal services as set forth below.

1.  CONDITIONS. This agreement will not take effect and attorney will have no
    obligation until this agreement is signed and the retainer is paid to Attorney.

2.  SCOPE OF SERVICES: Attorney is retained to provide representation in the
    matter relating to an already filed lawsuit against the City of Vallejo and
    others relating to a claim of violation of Civil Rights. Attorney will represent
    client through trial and through any settlement negotiations whether they be
    by mediation, arbitration or other settlement procedure.

3.  RESPONSIBILITY OF PARTIES: Attorney will provide legal services
    reasonably related to protecting Clients' interests and will respond to Clients'
    inquiries and will advise Clients of the development of the case. Client agrees
    to be truthful with Attorney and to provide information to Attorney and to pay
    any invoices that are required of Clients, and to keep Attorney advised if there
    is any change of address or telephone number.

4.  LEGAL FEES: Client agrees to pay Attorney an initial retainer fee in the
    amount of $5,000.00 (Five Thousand Dollars). Attorney will also be entitled
    to be compensated for a percentage of 33.3% of a net recovery. A net
    recovery is the total of all amount recovered by way of settlement, judgment,
    arbitration or other disposition, including an award of attorney's fees, minus
    all costs and disbursements.

5.  NEGOTIABILITY OF FEES  The fees discussed are not set by law but are
    negotiated between Attorney and Client.

6.  COSTS: Client agrees to pay for the costs of the depositions in this case.
    Attorney will not bill separately for those expenses from Client except as an
    attorney fee if there is a settlement or other form of judgment.

*U.S. Bank Plaza*
*980 Ninth Street, 16 Fl.*
*Sacramento, California 95814*

1

*Tel: (916) 449-9937*
*Fax: (916) 449-0452*
*Email: jefffletcher@email.com*

7.   SETTLEMENT: Attorney will not make any settlement without Client
     authorization. Clients retain the absolute right to authorize any settlement.

8.   WITHDRAWAL OR DISCHARGE: Client may terminate Attorney's
     services at any time with written notice. Attorney may withdraw from the
     case with (a) client consent, or (b) court approval.

9.   EFFECTIVE DATE: The date that this contract becomes effective is the date
     that attorney begins to work on the case on behalf of Client. The date signed
     on the contract is for reference only.

Date: _10-13-05_          _____
                                        Richard Salavatto

Date: _10/13/05_          _____
                                        LaTeacheeah Salvatto

Date: _oct/13/2005_       _____
                                        Jamal Thrower

Date: _10/13/05_          _____
                                        Jeffrey Fletcher

2

SENDER
RICHARD SALVATTO

Cashiers Check for $2,500.00

Pay to David A. Dusenbury & Associates

Fed Ex To :
David A. Dusenbury & Associates
2501 Temple Avenue
Suite 308
Signal Hill CA 90755
2501 Temple Ave
Signal Hill, CA 90755-4036
Phone: (562) 492-9554
Fax: (562) 989-1757
Cellular: (310) 503-2114

---

**FedEx Express** · **US Airbill**

FedEx Tracking Number  8588 6158 1796

**Sender's Copy**

**1 From** Please print and press hard.

Date 11-14-06   Sender's FedEx Account Number

Sender's Name RICHARD SALVATTO   Phone (707) 648-0635

Company

Address 1114 VERVAIS AVE

City VALLEJO   State CA   ZIP 94591

**2 Your Internal Billing Reference** OPTIONAL
First 24 characters will appear on invoice.

**3 To**

Recipient's Name DAVID DUSENBURY   Phone 562 492-9554

Company DAVID DUSENBURY + ASSOC

Recipient's Address 2501 TEMPLE AVE
We cannot deliver to P.O. boxes or P.O. ZIP codes.   Dept/Floor/Suite/Room

Address SUITE 308
To request a package be held at a specific FedEx location, print FedEx address here.

City SIGNAL HILL   State CA   ZIP 90755-4036

**4a Express Package Service** *Packages up to 150 lbs.*

- FedEx Priority Overnight
- FedEx Standard Overnight
- FedEx First Overnight
- FedEx 2Day
- FedEx Express Saver

**4b Express Freight Service** *Packages over 150 lbs.*

- FedEx 1Day Freight
- FedEx 2Day Freight
- FedEx 3Day Freight

**5 Packaging**

- FedEx Envelope
- FedEx Pak
- FedEx Box
- FedEx Tube
- Other

**6 Special Handling**

- SATURDAY Delivery
- HOLD Weekday
- HOLD Saturday

Does this shipment contain dangerous goods?

- No
- Yes As per attached Shipper's Declaration
- Yes Shipper's Declaration not required.
- Dry Ice

Cargo Aircraft Only

**7 Payment** *Bill to:*

- Sender
- Recipient
- Third Party
- Credit Card
- Cash/Check

Total Packages   Total Weight   Total Declared Value

**8 NEW Residential Delivery Signature Options** If you require a signature, check Direct or Indirect.

- No Signature Required
- Direct Signature
- Indirect Signature

520

Ship and track packages at fedex.com
Simplify your shipping. Manage your account. Access all the tools you need.



**Bank of America**

Cashier's Check

No. 41517221

05-14-3774B  09-2005

Banking
Center

SPRINGFIELD

000578 00002  0051122177

Pay
To
The
Order
Of

**TWO THOUSAND FIVE HUNDRED DOLLARS AND 00 CENTS**

**DAVID A. DUSENBURY & ASSOCIATES**

Date  NOVEMBER 14, 2006

Remitter (Purchased By)  RICHARD D. SALVATTO

$  **2500.00**

Bank of America, N.A.
San Francisco, CA

VOID AFTER 90 DAYS

Authorized Signature

⑆415172217⑆ ⑈121000358⑈ 13970 ⑈8507⑆

THE ORIGINAL DOCUMENT HAS REFLECTIVE WATERMARK ON THE BACK          THE ORIGINAL DOCUMENT HAS REFLECTIVE WATERMARK ON THE BACK

Notice to Purchaser: In the event this check is lost, misplaced or stolen, a sworn statement of non-receipt of goods will be required prior to replacement. This check should be surrendered when replacement check is issued.



*Jeffrey Fletcher*
*Attorney At Law*
October 14, 2005

***VIA FACSIMILE AND U.S MAIL (916) 553-4141***

Donald D. Beury
Attorney at Law
1006 Fourth Street, Suite 307
Sacramento, CA 95814

### *Re: LaTeacheeah Salvatto v. City of City of Vallejo*

Dear Mr. Beury:

I have been retained by LaTeacheeah Salvatto in her case against the City of Vallejo and the Vallejo Police Department. She informed me that she came to your office yesterday to confirm the termination and to pick up her file. She informed me that you refused to give her the file and refused to substitute out of the case.

As you know, discovery closed, including the taking of depositions, on August 8, 2005. Mrs. Salvatto represents that she paid you to take depositions after the close of discovery. If she paid you this money, and if the depositions have not been taken, please return the money to me on her behalf and I can put it in my trust account. Have there been any motions filed or set for hearing?

Your contract with Mrs. Salvatto states: "Attorney will pursue a lawsuit for Personal Injury, police brutality, violation of civil rights, and false arrest negligence other related causes of action against the Vallejho [sic] Police Department. . . ." Did you amend the complaint? Obviously, I need the file to determine the status of the case. Please contact me immediately.

Sincerely,

LAW OFFICE O F JEFFREY FLETCHER

Jeffrey Fletcher

cc: LaTeacheeah Salvatto

*U.S. Bank Plaza*
*980 Ninth Street, 16 Fl.*
*Sacramento, California 95814*

*Tel: (916) 449-9937*
*Fax: (916) 419-0452*
*Email: jefffletcher@email.com*

**From:** Jeffrey Fletcher [mailto:jefffletcher@email.com]
**Sent:** Thursday, March 22, 2007 1:19 PM
**To:** Salvatto, Richard D (Rich)
**Subject:** RE: Status

The expert witnesses did not come up in this motion. The issue in a summary judgment motion is whether, assuming the facts most favorable to the plaintiff, the defendant is entitled to a judgment because the law requires that result? The issue in the motion concerns the facts. If everything that Lateacheah says is true, is the City still entitled to a judgment because they were allowed to do what they did?

I will talk to Lateacheah about the depositions. Generally, when I was hired to substitute in on the case, it was about to be dismissed at a previously set motion for summary judgment. Your attorney had not responded to the motion and the case was going to be dismissed. Also, the complaint was defective because the attorney never filed a claim against the City and did not properly set forth the claims that should have been set forth in a lawsuit such as this one. Jamal should have not been included in this suit and it wrongfully claimed that the officers broke her foot. Because of these defects, I was not going to pay for the depositions in a case with these problems. My intent was to keep the suit alive and obtain a recovery for you all. I kept it alive and now I am seeking the recovery. I was real clear about me not paying for the depositions.

Jeff

----- Original Message -----
From: "Salvatto, Richard D \(Rich\)"
To: "Jeffrey Fletcher"
Subject: RE: Status
Date: Thu, 22 Mar 2007 11:21:59 -0500

Jeffery,

Did the judge read our expert's opinion? It does not sound like he did.

As far as the other costs - Lateacheeah wants to discuss this with you. She is still confused as to who pays what in a contingency case.

Regards,

Richard

**From:** Jeffrey Fletcher [mailto:jefffletcher@email.com]
**Sent:** Wednesday, March 21, 2007 12:01 PM
**To:** Salvatto, Richard D (Rich)
**Subject:** Re: Status

The session went well. We are now awaiting the judge's order. At first the judge
seemed to feel that the police had no alternative except to arrest her since she would not
stop calling. What else could the police do?

Initially I argued what I thought was an important technical argument, which was that the
police could not arrest her for the offense that the arrested her for. There was no way that
she could be guilty of it and that is why the charges were later dismissed. This raised the
issue of whether the station was open or closed to the public, which was the statute that
they arrested her for. The judge felt that argument did not make too much of a difference,
since if she was obstructing, it did not matter whether the station was open or closed to
the public.

Through that argument, I learned that the judge thought that Lateacheah was arrested
inside the lobby. I then argued that it was illegal to arrest a citizen in the public place
simply because they were tired of her. I also explained that the reason for the number of
calls was not to interfere but to seek assistance, clarification and safety. The judge then
asked the City whether or not she was inside the lobby when she was arrested. The
attorney tried to evade the question but the judge persisted and the attorney admitted that
she was outside.

I do not know what the judge will do, but I think that we put up a good argument.

In terms of where we go from here, I need the payment on the deposition transcripts
which I addressed in my last email. I need that money immediately as the deposition
company is calling me for payment.

Sincerely,

Jeffrey Fletcher

----- Original Message -----
From: "Salvatto, Richard D \(Rich\)"
To: "Jeffrey Fletcher"
Subject: Status
Date: Wed, 21 Mar 2007 10:24:01 -0500

Jeffrey,

What happened at the court session this week?
What are the next steps?

Regards.
Richard

**From:** Jeffrey Fletcher [mailto:jefffletcher@email.com]
**Sent:** Saturday, March 03, 2007 5:04 AM
**To:** Salvatto, Richard D (Rich)
**Subject:** RE: Fee for expert witness deposition

Mrs. Salvatto:

As to your marriage, I have only shown respect for it. What I wrote is not incorrect. I was speaking to Mr. Salvatto and I mentioned his house. There is nothing sinister or super analytical. It's an email. I too am married and have 6 children. We love our marriages and we love our kids. Great. Why are we talking about this?

We are in the final throws of your case. I am very committed to the case, but now is the time for us to be on the same page. Now is the time to be a team. I flew down to Long Beach on February 21 to defend our expert's deposition. I was in Stockton on February 28 to take their expert's deposition. It was important that I did take his deposition. If you do not take the expert's deposition, they will come to trial and say anything and you are stuck because you never deposed them. I had to pay him $500 and I do need that money back.

There are other costs, some of which have not been paid:

| | |
|---|---|
| Depositions of Leslie Barden and Mary Ramons | $367.80 |
| Deposition of Corporal John Whitney | 309.00 |
| Deposition of Thomas Liddicoet & Schroeder | 658.25 |
| Deposition of Jeremy Huggs & Kevin McCarthy | 835.28 |
| Deposition of Brett Clark | 584.45 |
| Total | $2,754.78 |

Mr. Buery has not paid the $1,400. I paid that so that we could take the depositions of the defendants.

There is going to be a lot of movement on your case. I apologize for the poor communication. There is a motion for summary judgment filed against your case with a hearing date set for March 19, 2007 at 1:30 in court room 5. I am preparing for that now. That was the same motion that was set to be heard when I was first retained.

I am committed to your case. Now is the time for us to be on the same team. When the case goes to trial, it is critical that we be on the same team. I cannot emphasize this enough. We need to schedule a meeting so that you all can be briefed on where we are and the strategy for the future. We also need to seriously evaluate your interests in settlement and for how much. Right now, I have some open time this week and more time next week.
With all of that said, I still need that expert's fee because I already paid it, and it was necessary for your case.

----- Original Message -----
From: "Salvatto, Richard D \(Rich\)"
To: "Jeffrey Fletcher"
Subject: RE: Fee for expert witness deposition
Date: Sat, 3 Mar 2007 01:11:51 -0600

Mr. Fletcher

First of all I would like to clarify the last sentence of your email below (highlighted in red) Richard and I are married and have 5 children. I came back home, not "before she had come to your home." My marriage means everything to me and a statement which undermines or questions the validity of it greatly offends me. We have worked very hard throughout many years to build our family and make our house a home.

Regarding the matter of the disposition of Jared Zwickey; I believe I should have been asked whether or not I wanted him deposed if you expected to receive payment from us. I think his written statement stood by it self as an example of his complete lack of expertise and I see no reason to have wasted money on deposing him. Surely the opposition must know this as well after they deposed our expert. In addition, when you agreed to take this case you were given $5,000.00 and at that time I explicitly asked you the following questions:

1) Does this $5,000 cover the cost of dispositions and everything? You replied "Yes."
2) Are you going to be able to get my $3,000 back from Donald Buery? You replied that it should not be a problem. In addition the court demanded that Buery return my $3,000 as well as sanctioning a fine of $1,400 that was to be paid to the defendants by the plaintiff. You told me that you received a check in the amount of $2,500 from Donald Buery. You returned $1,000 to me .
3) I had asked you to keep the $1,500 to put toward an expert witness if one was needed. You replied "OK, that's a good idea" I then stated that the total of $6,500 should be enough to take care of all costs. You replied " That should cover everything" Is this not correct?
4) When you found an expert witness you had my husband rush $2,500 to him in order for him to write a report in time to meet a deadline. He did so but I was very upset at the time. Why was this necessary given the above?

Now let me state the problems I have regarding paying you for the most recent deposition. I feel the monies I have already given you are sufficient to cover all costs. My understanding was you had taken the case on a contingency basis and that you would receive 33% of any award when the case is settled. Now when you take this disposition you ask for additional funds. I am puzzled as to why you would even mention money at the junction. You deposed the police officers without asking for any money, true?

Now you have sent 4 emails and two telephone calls within two days. I am amazed as I have not had much luck having you contact me. I had to send you a registered letter regarding the fact that you did not return my calls or respond to any of my quests. I still do not hear from you unless it is an urgent call for money! You forced us to pay for our expert witness saying the other side had an expert and if we did not get one by the deadline we would lose our case.

I raised this issue with you at that time and you told me that the $5,000 was your retainer and that I agreed to pay costs and fees. You also said that the other $1,500 was used to pay the defendants – I just never know what to believe. You seem to say different things at different times.

LaTeacheeah Salvatto

**From:** Jeffrey Fletcher [mailto:jefffletcher@email.com]
**Sent:** Thursday, March 01, 2007 1:36 AM
**To:** Salvatto, Richard D (Rich)
**Subject:** Re:

I completed the deposition of the expert for the City of Vallejo. The purpose of this deposition was to find out the basis for the opinions of their expert witness. His initial opinion is that Lateachea's arrest was valid and based upon probable cause. His opinion is that she violated a statute that says that it is a trespass for a person to interferre with a business open to the public. He did his best to protect the City. I got him to acknowledge that being on the outside of the police building is not a trespass. It is a public place. Next, we battled over the term "open to the public," because the building was not open to the public. The station was closed to the public which was why she had to use the outside telephone. He tried to say that once the officers let her inside, it was open to the public, but he was merely trying to extend his protection of the department. My positio is that the arrest was invalid because the statute that she was arrested under was not violated. Also, if the arrest was unlawful, the the tow of the car was unlawful..Finally, when the officers pushed her outside the station, this was an unreasonable use of force. The officers could use a reasonable amount of force to effectuate an arrest, but the pushing incident was not an arrest. The pushing incident occured befoe she had come to your home. She later went back up to the station and was arrested. We can talk later and I can give more detail.

The depositon lasted fore two and a half hours. I gave the expert a check for $500, as he charges $200 per hour for his deposition testimony. I therefore need to get that check from you. Please contact me so that we can make that arrangment. Thank you.

Sincerely,

Jeffrey Fletcher

**From:** Jeffrey Fletcher [mailto:jefffletcher@email.com]
**Sent:** Thursday, March 01, 2007 5:33 PM
**To:** Salvatto, Richard D (Rich)
**Subject:** Re: Fee for expert witness deposition

I am still waiting to hear from you regarding the expert deposition fee which I have paid.
This email and any files transmitted with it are confidential,
proprietary
and intended solely for the individual or entity to whom they are
addressed.
If you have received this email in error please delete it immediately.

**From:** Jeffrey Fletcher [mailto:jefffletcher@email.com]
**Sent:** Thursday, March 01, 2007 1:36 AM
**To:** Salvatto, Richard D (Rich)

I completed the deposition of the expert for the City of Vallejo. The purpose of this deposition was to find out the basis for the opinions of their expert witness. His initial opinion is that Lateachea's arrest was valid and based upon probable cause. His opinion is that she violated a statute that says that it is a trespass for a person to interferre with a business open to the public. He did his best to protect the City. I got him to acknowledge that being on the outside of the police building is not a trespass. It is a public place. Next, we battled over the term "open to the public," because the building was not open to the public. The station was closed to the public which was why she had to use the outside telephone. He tried to say that once the officers let her inside, it was open to the public, but he was merely trying to extend his protection of the department. My positio is that the arrest was invalid because the statute that she was arrested under was not violated. Also, if the arrest was unlawful, the the tow of the car was unlawful..Finally, when the officers pushed her outside the station, this was an unreasonable use of force. The officers could use a reasonable amount of force to effectuate an arrest, but the pushing incident was not an arrest. The pushing incident occured befoe she had come to your home. She later went back up to the station and was arrested. We can talk later and I can give more detail.

The depositon lasted fore two and a half hours. I gave the expert a check for $500, as he charges $200 per hour for his deposition testimony. I therefore need to get that check from you. Please contact me so that we can make that arrangment. Thank you.

Sincerely,
Jeffrey Fletcher

-----Original Message-----
From: Jeffrey Fletcher <jefffletcher@email.com>
To: Salvatto, Richard D (Rich)
Sent: Wed Feb 28 10:24:19 2007
Mr. Salvatto:

Today I take the deposition of the expert witness for the City of Vallejo in Stockton at
1:00 p.m. Last week on Wednesday, February 21, the City took the deposition of our
expert, Mr. Dusenbury. He did an excellent job and was very supportive of our position.

I should have contacted you earlier, but I need to pay their expert fee to take his
deposition. As you know, he charges $200 per hour. I expect that the deposition will
take 2 hours. I therefore need $400 to pay their expert. I will contact you this evening to
make the arrangement to obtain that fee. This deposit on is very important to our case,
and I expect to do a good job today.

I will contact you later.

Sincerely,
Jeffrey Fletcher


You paid our expert a $2,500 retainer for the use of his services. When the City took Mr.
Dusenbury's deposition last Thursday, they had to pay him out of their pocket for the
time at the deposition. Thus, Dusenbury received a fee from us and a fee from the City to
take his deposition. Now we are taking the deposition of the City's expert and we have to
pay him for his time at his deposition. Their expert is Jared L. Zwickey out of Stockton. I
am sure the City paid him a retainer for his services, but we have to pay to take his
deposition. Let me know if you have any other questions. You can also reach me on my
cell phone at (916) 519-6470 as I will be heading to Stockton soon.

Jeff Fletcher

----- Original Message -----
From: "Salvatto, Richard D \(Rich\)"
To: jefffletcher@email.com
Subject: Re:
Date: Wed, 28 Feb 2007 11:01:45 -0600


Jeffery

l paid him 2500 and that fee was supposed to cover the report and dispositions and when
I talked to him some months ago he said there might even be some time left over for a
trial appearence

So I am confused.

Rich

-----Original Message-----
From: Jeffrey Fletcher <jefffletcher@email.com>
To: Salvatto, Richard D (Rich)
Sent: Wed Feb 28 10:24:19 2007


Mr. Salvatto:

Today I take the deposition of the expert witness for the City of Vallejo in Stockton at
1:00 p.m. Last week on Wednesday, February 21, the City took the deposition of our
expert, Mr. Dusenbury. He did an excellent job and was very supportive of our position.

I should have contacted you earlier, but I need to pay their expert fee to take his
deposition. As you know, he charges $200 per hour. I expect that the deposition will
take 2 hours. I therefore need $400 to pay their expert. I will contact you this evening to
make the arrangement to obtain that fee. This deposit on is very important to our case,
and I expect to do a good job today.

I will contact you later.

Sincerely,

Jeffrey Fletcher
\

**From:** Jeffrey Fletcher [mailto:jefffletcher@email.com]
**Sent:** Tuesday, November 14, 2006 10:43 AM
**To:** Salvatto, Richard D (Rich)
**Subject:** expert witness retention

Mr. Salvatto:

Our opposition has retained an expert witness to testify that the arrest and detention of
Mrs. Salvatto was proper. We have the right to have an expert to rebut their expert
witness. I have found David A. Dusenbury, who was one of several that I have talked
to. Mr. Dusenbury's web site is dwww.dusenburypolicesecurityexperts.com. I have
already designated him as our retained expert. He must now review the depositions
and other documents in the case and write a report by November 22, 2006. His retainer
fee is $2,500, which must be paid immediately. You can refer to his web site and see his
experience, fee schedule, and CV. Once you give me the OK, I will send him the
documents that he needs to write the report. It needs to be Fedex'd today. If you agree to
use him, we can arrange for you to send him the check directly. Of course, he will not
start without the check. I look forward to hearing from you.

Jeff Fletcher

**From:** Salvatto, Richard D (Rich)
**Sent:** Tuesday, April 03, 2007 1:15 PM
**To:** Jeffrey Fletcher
**Subject:** RE: Fee for expert witness deposition

Jeffery,

We are still unhappy about paying all of these fees but since we will be leaving town soon we
wanted to know where we send this money to? Do we write a check to you or to some company?

Also how is the case going? What is next? Please let us know as soon as possible
The Salvattos

| There are other costs, some of which have not been paid: | |
| --- | --- |
| Depositions of Leslie Barden and Mary Ramons | $367.80 |
| Deposition of Corporal John Whitney | 309.00 |
| Deposition of Thomas Liddicoet & Schroeder | 658.25 |
| Deposition of Jeremy Huggs & Kevin McCarthy | 835.28 |
| Deposition of Brett Clark | 584.45 |
| Total | $2,754.78 |

**From:** Salvatto, Richard D (Rich)
**Sent:** Saturday, March 03, 2007 9:12 AM
**To:** Jeffrey Fletcher
**Subject:** RE: Fee for expert witness deposition


Ok, still not satisfied but we will send you a check for the $500. today

**From:** Jeffrey Fletcher [mailto:jefffletcher@email.com]
**Sent:** Thursday, March 01, 2007 5:33 PM
**To:** Salvatto, Richard D (Rich)
**Subject:** Re: Fee for expert witness deposition


I am still waiting to hear from you regarding the expert deposition fee which I have paid.

Till Friday   afternoon  your time

Palace Hotel Tokyo
1-1-1 Marunouchi, Chiyoda-ku
Tokyo,  100-0005 Japan
Phone 011- 81-3-3211-5211
Room 762

> From Friday Midnight till Tuesday 7PM your time
>
> Millennium Seoul Hilton
> 395, 5-ga, Namdaemun-ro, Chung-gu, Seoul, South Korea
> Phone 011- 82-2-3173114
>
> From  Wednesday 24th, 6AM your time
> Regal Airport Hotel
> 9 Cheong Tat Road, Hong Kong International Airport,
> Chek Lap Kok, Hong Kong.
> 011-852 2286 8888
>
> --------------------------------------------------------------------------------
> Date :Jan 25, 2007 From :Hong Kong, China To :San Francisco,
> Singapore Airlines (SQ) Flight 2
> Depart :9:55p - Hong Kong  Arrive :5:55p - San Francisco
>
> we can go to Scomas for dinner if you like

I looked at what Fletcher sent and I do not see any difference with the
previous one.  It is 16 pages without his background information.

LaTeacheeah G. Salvatto
1114 Vervais Avenue
Vallejo, CA 94591

October 16, 2006

Mr. Jeffery Fletcher
Attorney at Law
980 9th St Fl 16
Sacramento, CA 95814

Re: Case Number CIV.S04-0163WBS GGH

Dear Mr. Fletcher:

The purpose of this letter is to make a formal statement about the way you have responded to the calls, messages, and conversations I have had with you. I called you two weeks ago and left a message asking you to return my call. As of yet I have not heard from you. You always fail to return my calls or messages whether email, telephone messages, or written.

Over two months ago I requested a copy of the depositions taken from the police officers and dispatcher involved in my case. I am making that request once again. I repeated this request when we spoke of Ivy's case and you gave your word to send them, but they have not arrived.

On the same call you mentioned that the part of the case that involved my husband Richard was not strong enough or hard to prove and hinted that perhaps that part of the case should be dropped. You said the same thing about Jamal. I am not sure what you have actually done regarding Jamal's status as a plaintiff in this case. I would hope that you would notify me officially of any impending changes in my case before making any formal communications or changes with the court. Other than the notices of the dispositions, I have not received any documentation on my case. I would appreciate copes of any communications regarding my case.

I have not agreed to any changes in the structure of the case or the number of plaintiffs. Under no circumstances is my husband to be negotiated out of this case unless it is part of an amicable settlement. I do not want you to take any action before you discuss it with me. My whole family has suffered through this ordeal, make no mistake about that! We will not compromise our integrity to lighten anyone's load.

I will be in Sacramento in a few weeks and would be happy to stop by your office and pick up the dispositions along with any other documentation you have for me.

Sincerely,

LaTeacheeah G. Salvatto

## Salvatto, Richard D (Rich)

**From:** Jeffrey Fletcher [jefffletcher@email.com]

**Sent:** Wednesday, February 28, 2007 12:52 PM

**To:** Salvatto, Richard D (Rich)

**Subject:** Re:

You paid our expert a $2,500 retainer for the use of his services. When the City took Mr. Dusenbury's deposition last Thursday, they had to pay him out of their pocket for the time at the deposition. Thus, Dusenbury received a fee from us and a fee from the City to take his deposition. Now we are taking the deposition of the City's expert and we have to pay him for his time at his deposition. Their expert is Jared L. Zwickey out of Stockton. I am sure the City paid him a retainer for his services, but we have to pay to take his deposition. Let me know if you have any other questions. You can also reach me on my cell phone at (916) 519-6470 as I will be heading to Stockton soon.

Jeff Fletcher

----- Original Message -----
From: "Salvatto, Richard D \(Rich\)"
To: jefffletcher@email.com
Subject: Re:
Date: Wed, 28 Feb 2007 11:01:45 -0600

Jeffery

I paid him 2500 and that fee was supposed to cover the report and dispositions and when I talked to him some months ago he said there might even be some time left over for a trial appearence

So I am confused.

Rich

-----Original Message-----
From: Jeffrey Fletcher <jefffletcher@email.com>
To: Salvatto, Richard D (Rich)
Sent: Wed Feb 28 10:24:19 2007


Mr. Salvatto:

Today I take the deposition of the expert witness for the City of Vallejo in Stockton at 1:00 p.m. Last week on Wednesday, February 21, the City took the deposition of our expert, Mr. Dusenbury. He did an excellent job and was very supportive of our position.

I should have contacted you earlier, but I need to pay their expert fee to take his deposition. As you know, he charges $200 per hour. I expect that the deposition will take 2 hours. I therefore need $400 to pay their expert. I will contact you this evening to make the arrangement to obtain that fee. This deposit on is very important to our case, and I expect to do a good job today.

I will contact you later.

Sincerely,

Jeffrey Fletcher

2/28/2007

Mr. Fletcher

First of all I would like to clarify the last sentence of your email below (highlighted in red)  Richard and I are married and have 5 children. I came back home, not "before she had come to your home." My marriage means everything to me and a statement which undermines or questions the validity of it greatly offends me. We have worked very hard throughout many years to build our family and make our house a home.

Regarding the matter of the disposition of Jared Zwickey; I believe I should have been asked whether or not I wanted him deposed if you expected to receive payment from us. I think his written statement stood by it self as an example of his complete lack of expertise and I see no reason to have wasted money on deposing him. Surly the opposition must know this as well after they deposed our expert.

In addition, when you agreed to take this case you were given $5,000.00 and at that time I explicitly asked you the following questions:

1) Does this $5,000 cover the cost of dispositions and everything? You replied "Yes."
2) Are you going to be able to get my $3,000 back from Donald Buery? You replied  that it should not be a problem. In addition the court demanded that Buery return my $3,000 as well as sanctioning a fine of $1,400 that was to be paid to the defendants by the plaintiff. You told me that you received a check in the amount of $2,500 from Donald Buery. You returned $1,000 to me .
3) I had asked you to keep the $1,500 to put toward an expert witness if one was needed. You replied "OK, that's a good idea"  I then stated that the total of $6,500 should be enough to take care of all costs. You replied " That should cover everything" Is this not correct?
4) When you found an expert witness you had my husband rush $2,500 to him in order for him to write a report in time to meet a deadline. He did so but I was very mad at the time. Why was this necessary given the above?

Now let me state the problems I have regarding paying you for the most recent deposition. I feel the monies I have already given you are sufficient to cover all costs. My understanding was you had taken the case on a contingency basis and that you would receive 33% of any award when the case is settled. Now when you take this disposition you ask for additional funds. I am puzzled as to why you would even mention money at the junction. You deposed the police officers without asking for any money, true?

Now you have sent 4 emails and two telephone calls within two days.  I am amazed as I have not had much luck having you contact me.  I had to send you a registered letter regarding the fact that you did not return my calls or respond to any of my quests.  I still do not hear from you unless it is an urgent call for money!  You forced us to pay for our expert witness saying the other side had an expert and if we did not get one by the deadline we would lose our case.

I raised this issue with you at that time and you told me that the $5,000 was your retainer and that I agreed to pay costs and fees. You also said that the other $1,500 was used to pay the defendants -- I just never know what to believe. You seem to say different things at different times.

LaTeacheeah Salvatto

---

**From:** Jeffrey Fletcher [mailto:jefffletcher@email.com]
**Sent:** Thursday, March 01, 2007 1:36 AM

**Salvatto, Richard D (Rich)**

---

**From:** Jeffrey Fletcher [jefffletcher@email.com]

**Sent:** Thursday, March 01, 2007 1:36 AM

**To:** Salvatto, Richard D (Rich)

**Subject:** Re:

I completed the deposition of the expert for the City of Vallejo. The purpose of this deposition was to find out the basis for the opinions of their expert witness. His initial opinion is that Lateachea's arrest was valid and based upon probable cause. His opinion is that she violated a statute that says that it is a trespass for a person to interferre with a business open to the public. He did his best to protect the City. I got him to acknowledge that being on the outside of the police building is not a trespass. It is a public place. Next, we battled over the term "open to the public," because the building was not open to the public. The station was closed to the public which was why she had to use the outside telephone. He tried to say that once the officers let her inside, it was open to the public, but he was merely trying to extend his protection of the department. My positio is that the arrest was invalid because the statute that she was arrested under was not violated. Also, if the arrest was unlawful, the the tow of the car was unlawful..Finally, when the officers pushed her outside the station, this was an unreasonable use of force. The officers could use a reasonable amount of force to effectuate an arrest, but the pushing incident was not an arrest. The pushing incident occured befoe she had come to your home. She later went back up to the station and was arrested. We can talk later and I can give more detail.

The depositon lasted fore two and a half hours. I gave the expert a check for $500, as he charges $200 per hour for his deposition testimony. I therefore need to get that check from you. Please contact me so that we can make that arrangment. Thank you.

Sincerely,

Jeffrey Fletcher

----- Original Message -----
From: "Salvatto, Richard D \(Rich\)"
To: jefffletcher@email.com
Subject: Re:
Date: Wed, 28 Feb 2007 11:01:45 -0600

Jeffery

I paid him 2500 and that fee was supposed to cover the report and dispositions and when I talked to him some months ago he said there might even be some time left over for a trial appearence

So I am confused.

Rich

-----Original Message-----
From: Jeffrey Fletcher <jefffletcher@email.com>
To: Salvatto, Richard D (Rich)
Sent: Wed Feb 28 10:24:19 2007

Mr. Salvatto:

Today I take the deposition of the expert witness for the City of Vallejo in Stockton at 1:00 p.m. Last week on Wednesday,

3/1/2007

February 21, the City took the deposition of our expert, Mr. Dusenbury. He did an excellent job and was very supportive of our position.

I should have contacted you earlier, but I need to pay their expert fee to take his deposition. As you know, he charges $200 per hour. I expect that the deposition will take 2 hours. I therefore need $400 to pay their expert. I will contact you this evening to make the arrangement to obtain that fee. This deposit on is very important to our case, and I expect to do a good job today.

I will contact you later.

Sincerely,

Jeffrey Fletcher

--

<http://a8-asy.a8ww.net/a8-ads/adftrclick?redirectid=en-mail_a_01>

```
This email and any files transmitted with it are confidential, proprietary
and intended solely for the individual or entity to whom they are addressed.
If you have received this email in error please delete it immediately.
```

--



**Franchise Opportunities**
Find hundreds of Franchises and Business Opportunities online.
betheboss.com

**To:** Salvatto, Richard D (Rich)
**Subject:** Re:

I completed the deposition of the expert for the City of Vallejo. The purpose of this deposition was to find out the basis for the opinions of their expert witness. His initial opinion is that Lateachea's arrest was valid and based upon probable cause. His opinion is that she violated a statute that says that it is a trespass for a person to interferre with a business open to the public. He did his best to protect the City. I got him to acknowledge that being on the outside of the police building is not a trespass. It is a public place. Next, we battled over the term "open to the public," because the building was not open to the public. The station was closed to the public which was why she had to use the outside telephone. He tried to say that once the officers let her inside, it was open to the public, but he was merely trying to extend his protection of the department. My positio is that the arrest was invalid because the statute that she was arrested under was not violated. Also, if the arrest was unlawful, the the tow of the car was unlawful..Finally, when the officers pushed her outside the station, this was an unreasonable use of force. The officers could use a reasonable amount of force to effectuate an arrest, but the pushing incident was not an arrest. The pushing incident occured befoe she had come to your home. She later went back up to the station and was arrested. We can talk later and I can give more detail.

The depositon lasted fore two and a half hours. I gave the expert a check for $500, as he charges $200 per hour for his deposition testimony. I therefore need to get that check from you. Please contact me so that we can make that arrangment. Thank you.

Sincerely,

Jeffrey Fletcher

---

**From:** Jeffrey Fletcher [mailto:jefffletcher@email.com]
**Sent:** Thursday, March 01, 2007 5:33 PM
**To:** Salvatto, Richard D (Rich)
**Subject:** Re: Fee for expert witness deposition

I am still waiting to hear from you regarding the expert deposition fee which I have paid.

## Salvatto, Richard D (Rich)

**From:** Jeffrey Fletcher [jefffletcher@email.com]

**Sent:** Saturday, March 03, 2007 5:04 AM

**To:** Salvatto, Richard D (Rich)

**Subject:** RE: Fee for expert witness deposition

Mrs. Salvatto:

As to your marriage, I have only shown respect for it. What I wrote is not incorrect. I was speaking to Mr. Salvatto and I mentioned his house. There is nothing sinister or super analytical. It's an email. I too am married and have 6 children. We love our marriages and we love our kids. Great. Why are we talking about this?

We are in the final throws of your case. I am very committed to the case, but now is the time for us to be on the same page. Now is the time to be a team. I flew down to Long Beach on February 21 to defend our expert's deposition. I was in Stockton on February 28 to take their expert's deposition. It was important that I did take his deposition. If you do not take the expert's deposition, they will come to trial and say anything and you are stuck because you never deposed them. I had to pay him $500 and I do need that money back.

There are other costs, some of which have not been paid:

| | |
|---|---|
| Depositions of Leslie Barden and Mary Ramons | $367.80 |
| Deposition of Corporal John Whitney | 309.00 |
| Deposition of Thomas Liddicoet & Schroeder | 658.25 |
| Deposition of Jeremy Huggs & Kevin McCarthy | 835.28 |
| Deposition of Brett Clark | 584.45 |
| Total | $2,754.78 |

Mr. Buery has not paid the $1,400. I paid that so that we could take the depositions of the defendants.

There is going to be a lot of movement on your case. I apologize for the poor communication. There is a motion for summary judgment filed against your case with a hearing date set for March 19, 2007 at 1:30 in court room 5. I am preparing for that now. That was the same motion that was set to be heard when I was first retained.

I am committed to your case. Now is the time for us to be on the same team. When the case goes to trial, it is critical that we be on the same team. I cannot emphasize this enough. We need to schedule a meeting so that you all can be briefed on where we are and the strategy for the future. We also need to seriously evaluate your interests in settlement and for how much. Right now, I have some open time this week and more time next week.

With all of that said, I still need that expert's fee because I already paid it, and it was necessary for your case.



*Jeffrey Fletcher*
*Attorney At Law*

October 31, 2005

Richard Salvatto
LaTeacheeah Salvatto
1114 Vervais Avenue
Vallejo, CA 94591

Dear Richard and LaTeacheeah:

I hope that you are doing well. Enclosed with this letter, please find a Substitution of Attorney and an Authorization for Release of Legal Documents for you all to sign. Initially, I wanted you to sign the substitution *in pro per* and then file a motion to be heard in court, but the federal courts usually require permission before a person can represent themselves. I want us to get into court as soon as possible to request the court to allow us to reopen discovery. Also, the complaint is defective on its face and if in fact no depositions have been taken, I believe that the court will grant you relief. Additionally, since the complaint is defective, it needs to be amended. The current complaint has not alleged a constitutional violation and that the police acted under color of law. These allegations are expected in a case like this and it makes this case more substantial.

I have read LaTeacheeah's report of the incident, the police report, and other documents in the case. I can see clearly what happened in that they simply did not want to give you any respect. The officers became irritated when you insisted on being treated like any other citizen. Your arrest was the consequence.

Ironically, you were arrested for violating Penal Code section 602.1(a), but that section requires the establishment to be "open to the public." It was never established that the Police station at that time was "open to the public.

It is critical that we persuade the judge to reopen discovery and to allow the filing of an amended complaint. There are a lot of issues in this case that need to be developed. For example, the officers never really talked to you about the purpose for which you went to the station. If they had let Officer Whitney speak to you, perhaps none of this would have happened. Some questions that need to be discovered include the front door protocol; why did they have you wait for so long – what were they doing? Why was Jamal arrested? What is the department's procedure for contacting parents of juveniles who are arrested? Why was your car towed?

*U.S. Bank Plaza*                                                                                              *Tel: (916) 449-9937*
*980 Ninth Street, 16 Fl.*                                                                                     *Fax: (916) 419-0452*
*Sacramento, California 95814*                                                           *Email: jefffletcher@email.com*

Page Two
October 31, 2005

You have a great case as long as the court allows us to obtain discovery and amend the complaint. I want to approach the court directly because you injury and the nature of the case is evident. The judge knows what type of case this is and that the complaint in its present form does not reflect it.

Please sign the forms and send the signed Substitution of Attorney form and the Release to Mr. Beury in the envelope provided immediately.

Sincerely,

Jeffrey Fletcher
Attorney at Law



# FAX TRANSMISSION

| | | | |
|---|---|---|---|
| Date: | **October 18, 2005** | Number of pages including cover sheet: | **3** |

| **FAX TO** | | **FAX FROM** | |
|---|---|---|---|
| Name: | **Jeffrey Fletcher** | Name: | Richard D. Salvatto |
| Company: | Attorney at Law | Department: | Director EDM Analytics |
| Location: | Sacramento | Location: | San Rafael, California |
| FAX #: | 916-419-0452 | FAX #: | 415-446-6193 |
| | | Cell #: | 415-359-3498 |
| Phone #: | 916-449-9937 | Phone #: | 415-491-5187 |
| Copy To: | LaTeacheeah Anderson Salvatto | Email: | richsalvatto@fairisaac.com |
| Subject: | **Attorney Client Agreement** | | |

Mr. Fletcher,

I have attached a copy of the signed attorney client agreement. I will send the original buy post today.

I am glad to see you taking on this case. I believe that the former attorney has not done a good job starting with his missing the deadline to file in State court. Since then he has not shown any initiative and has only responded to our repeated calls for action slowly at best.

Once he personally believed that the potential award was less than he had expected (he pined all of his hopes on the personal injury side of the case) he stopped working the case entirely. I believe that it was due to his negligence that the final dates for discovery were missed.

He claims to have filed to move the date for trial but has repeatedly failed to show us any proof of that or give us the new date he said was in April some time. The original date for trial was in January. He promised to file for an extension for discovery but when pressed on the issue he said he still needed to get around to that.

I was appalled at the way my wife was treated by the Vallejo police and could not believe it when I received the call from her that she had been arrested. Arrested for trying to obtain what was only her basic right, to first get the details on the arrest and detention of a juvenile without parental notification, and then to attempt to file charges against a police officer who assaulted her when she demanded her rights.

For someone who had experience in law enforcement, a business woman who had employed dozens of people and who ran for Mayor for the City of Vallejo – to be treated so shamefully can only be evidence of a level of racism I can not understand.

I look forward to meeting you and thank you again for taking on this case.

*Corporate Headquarters:* 200 SMITH RANCH ROAD, SAN RAFAEL, CA  94903-1996 USA

10/18/2005 TUE 08:54  FAX 415 446 6193        FAIR ISAAC CORPORATION                    ✉001

```
                          *********************
                          ***   TX REPORT   ***
                          *********************

     TRANSMISSION OK

     JOB NO.           0412
     DESTINATION ADDRESS 919164190452
     PSWD/SUBADDRESS
     DESTINATION ID
     ST. TIME          10/18 08:53
     USAGE T           00'38
     PGS.                 3
     RESULT            OK
```



*Jeffrey Fletcher*
Attorney At Law

### ATTORNEY CLIENT AGRREMENT

JEFFREY FLETHCER, ATTORNEY AT LAW ("Attorney") and RICHARD SALVATTO, LA TEACHEEAH SALVATTO, and JAMAL THROWER, a minor ("Client") hereby agree that Attorney will provide legal services as set forth below.

1.  CONDITIONS. This agreement will not take effect and attorney will have no obligation until this agreement is signed and the retainer is paid to Attorney.

2.  SCOPE OF SERVICES: Attorney is retained to provide representation in the matter relating to an already filed lawsuit against the City of Vallejo and others relating to a claim of violation of Civil Rights. Attorney will represent client through trial and through any settlement negotiations whether they be by mediation, arbitration or other settlement procedure.

3.  RESPONSIBILITY OF PARTIES: Attorney will provide legal services reasonably related to protecting Clients' interests and will respond to Clients' inquiries and will advise Clients of the development of the case. Client agrees to be truthful with Attorney and to provide information to Attorney and to pay any invoices that are required of Clients, and to keep Attorney advised if there is any change of address or telephone number.

4.  LEGAL FEES: Client agrees to pay Attorney an initial retainer fee in the amount of $5,000.00 (Five Thousand Dollars). Attorney will also be entitled to be compensated for a percentage of 33.3% of a net recovery. A net recovery is the total of all amount recovered by way of settlement, judgment, arbitration or other disposition, including an award of attorney's fees, minus all costs and disbursements.

5.  NEGOTIABILITY OF FEES   The fees discussed are not set by law but are negotiated between Attorney and Client.

6.  COSTS: Client agrees to pay for the costs of the depositions in this case. Attorney will not bill separately for those expenses from Client except as an attorney fee if there is a settlement or other form of judgment.

*U.S. Bank Plaza*
*980 Ninth Street, 16 Fl.*
*Sacramento, California 95814*

1

*Tel: (916) 449-9937*
*Fax: (916) 449-0452*
*Email: jefffletcher@email.com*

7.    SETTLEMENT: Attorney will not make any settlement without Client authorization. Clients retain the absolute right to authorize any settlement.

8.    WITHDRAWAL OR DISCHARGE: Client may terminate Attorney's services at any time with written notice. Attorney may withdraw from the case with (a) client consent, or (b) court approval.

9.    EFFECTIVE DATE: The date that this contract becomes effective is the date that attorney begins to work on the case on behalf of Client. The date signed on the contract is for reference only.

Date: _10-13-05_                                       
Richard Salavatto

Date: _10/13/05_                                       
LaTeacheeah Salvatto

Date: _oct/13/2005_                                    
Jamal Thrower

Date: _10/13/05_                                    
Jeffrey Fletcher

2

***DAVID A. DUSENBURY & ASSOCIATES***
***POLICE PRACTICES/SECURITY CONSULTANTS/EXPERTS***

*http://www.dusenburypolicesecurityexperts.com*

*Post Office Box 90819*
*Long Beach, CA 90809-0819*
*(562) 492-9554 (562) 989-1757 (F)*
*(310) 503-2114 (Cellular)*

*7765 SW Carrollon Drive*
*Beaverton, Oregon 97007*
*(503) 642-9554*
*E-mail: dadusen@aol.com*

December 19, 2006

## *DRAFT*

### *Salvatto v. City of Vallejo, et al*

Charles Jeffrey Fletcher, Esq.
Law Offices of Charles Jeffrey Fletcher
980 Ninth Street, 16th Floor
Sacramento, CA 95814

Dear Mr. Fletcher,

Pursuant to our agreement, I have reviewed the following documents concerning the ***Salvatto v. City of Vallejo, et al*** case:

1. Deposition of Kelly Schroeder.

2. Deposition of Corporal John Whitney.

3. Deposition of Thomas Liddicoet.

4. Deposition of William Brett Clark.

5. Defendants' Disclosure of Experts.

6. Expert Opinion Report, Jared I. Zwickey (12 pages).

7. Complaint (12 pages) for Violation of Civil Rights; False Arrest; Assault and Battery; Abuse of Process, Negligence: Loss of - - - - .

8. Vallejo Police Department Crime Report # 03-303 (7 pages including Attachments), charging 602.1 (b), dated 01/05/03, filed by B. Clark #436.

9. Incident at Vallejo Police Headquarters, Sunday January 5, 2000, Affirmed Statement of LaTeacheeah G. Anderson Salvatto (14 pages).

10. Declaration of Aimee Knight (2 pages).

11. Exhibit "A", Vallejo Police Department Transcript Excerpt (7 pages) from Digital Recording System, telephone call from LaTeacheeah Salvatto.

### *Please provide the following:*

1. Sergeant Schroeder's Supplemental Report.

2. Sergeant Schroeder's Declaration.

3. Vallejo Police Department Personnel Complaint Policy and Procedures.

4. Communications "Call History" (CAD) and audio recording of this event.

5. Vallejo Police Department Citizen's Complaint Policy and Procedures.

Based upon review of the above documents, I have made the following *preliminary* notes and formed the following *preliminary* opinions:

1. Deposition of Kelly Schroeder.

   (a) Page 6, he is a sergeant with the Vallejo Police Department. He was hired in 1986.

   (b) Page 11, Mrs. Salvatto came to the police department (after hours, the lobby was closed) to pick up her son who had been arrested and cited out. *That is inconsistent with the deposition of Corporal John Whitney, Page 20, "Jamal Thrower left, walking his motorized scooter." (Opinion)*

   (c) Page 12, Mrs. Salvatto refused to fill out a complaint form and was asked to leave the lobby.

   (d) Page 12, Lieutenant Liddicoet did not record the complaint.

   (e) Page 14, Mrs. Salvatto returned to file a complaint. Mrs. Salvatto wanted to file a criminal complaint against an involved officer. Lieutenant Liddicoet told him (Schroeder) that Mrs. Salvatto wanted to file a criminal complaint.

   (f) Page 15, Officers Whitney and McCarthy were the involved officers. The complaint involved battery.

   (g) Page 17, incident occurred in the police department lobby?

   (h) Page 18, "Well, generally she said she was unhappy with the service that she had received; that she felt that she was battered by Officer McCarthy while talking to him and Lieutenant Liddicoet. She wanted to file a complaint. Let me back up. She wanted a report taken because of that."

   (i) Page 18, he asked her to leave the department. She remained for another 5 minutes or so.

(j) Page 19, "Well, at that point our discussion generally became – I call it non-communicative. I told her that I'd be more than happy to give her or assist her in filling out the complaint form. She refused. Didn't want to do it. But yet she wanted a criminal report. Said I wouldn't do that. And that became the discussion for, you know, five, 10 minutes.

At that point, I made it clear that we couldn't talk anymore, that we weren't communicating, that she was here taking up my obligated time as well as her own to continue with this, and I asked her to leave."

(k) Page 19, within a 2-5 minute span she was ordered to leave.

(l) Page 20, "She ended up leaving out the glass doors."

(m)Page 20, "I believe she left under her own power." *She complied with his request to leave.*

(n) Page 21, within 2-3 minutes, Dispatch called him and *advised that Mrs. Salvatto was again requesting a criminal complaint be taken.*

(o) Pages 23-24, "After that I notified Corporal – I think it was Corporal at the time, Sergeant Clark about the interaction I had with Mrs. Salvatto. I believe I told him that I had talked to her, Lieutenant had to talked to her as well, that there was no merit to her complaint. *There was no merit at least to her wanting a criminal report.* She refused to accept the complaint form. And that I wanted him to go out there, and ask her to leave. And if not, at that point, she was obstructing, interfering with our business."

(p) Page 25, he states that he did not ask any officer to arrest her.

(q) Page 26, "I hear them talking near the gray phone, and then I saw them standing near her van, I believe she was driving at the time, or a larger car, out in front of the PD."

(r) Page 32, the next thing he observed, "Sergeant Clark came in and said she'd been arrested."

(s) Page 33, the reason she was arrested, "She refused to leave, interfering."

(t) Page 33, "I believe it was for the refusal to obey, interfering, not wanting to leave."

(u) Page 33, with regard to his observing the arrest, "I don't believe so." *Why doesn't he know?*

(v) Page 34, *he did direct Sergeant Clark to arrest Mrs. Salvatto, if she refused to leave.*

(w)Page 35, *"That officers had battered her, and she wouldn't leave until that was solved with a criminal report."*

3

Report of Charles Jeffrey Pletcher, Esq. – Salvatto v. City of Vallejo, et al.

Case 2:04-cv-00162-WBS-GGH — Document 62 — Filed 04/05/07 — Page 52 of 93

(x) Page 36, *attributes "Code of Silence" to everybody but law enforcement? It is a term that is used almost exclusively in regard to law enforcement.*

(y) Page 38, *approximately 45 minutes elapsed between the first time he talked to Mrs. Salvatto and her arrest.*

(z) Page 41, Mrs. Salvatto was hostile.

(aa) Pages 42-44, *he detected that Mrs. Salvatto had a tape recorder and he wanted to see and hear the tape. He reason was, "It's illegal to record a conversation without some else knowing." Schroeder is incorrect; it is not illegal to record a conversation under that circumstance. (Opinion)*

(bb) Page 43, he said he looked at it and there was no tape inside. Did he take the recorder from Mrs. Salvatto?

2. Deposition of Corporal John Whitney.

Page 6, with regard to the arrest (sic) of Jamal Thrower, "He was riding his motorized scooter on a sidewalk and riding without a helmet. I only issued him a citation, though, for the riding on the sidewalk."

(a) Page 10, with regard to his detention of and other name of Jamal Thrower, "When I got to the police station with him."

(b) Page 11, Thrower did not have any identification with him.

(c) Page 19, *Jamal Thrower was in the Vallejo Police Department database.*

(d) Page 19, Jamal Thrower, after being identified, was given a citation and released. *He declined a ride home. Because Thrower was taken into custody, and transported to the Vallejo Police Department, Thrower's parent, guardian or responsible relative should have been notified pursuant to 627 W.I.C. (Opinion)*

(e) Page 20, *Jamal Thrower left, walking his motorized scooter.*

(f) Page 21, *"A lady came to the Vallejo Police Department and was inquiring as to why he was detained and brought to the station."*

(g) Page 22, "I went out and talked to somebody who was later identified as I believe it's Lateacheeah Salvatto and tried to talk to her about stopping Mr. Thrower."

(h) Page 25, "She was unhappy with police services, wanted our names. I didn't have a business card. Lieutenant Liddicoet wrote my name on his business card. It was also on the citation that I had given Mr. Thrower."

(i) Page 26, he recorded the conversation with Mrs. Salvatto. He did not tell Mrs. Salvatto he was recording the conversation.

3. Deposition of Thomas Liddicoet.

   (a) Pages 7-8, "The first I think I remember was dispatch giving me a call at the watch commander's office saying there was a lady at the phone out front of the station causing a problem, refusing not to use the phone, basically making a disturbance." *Why would dispatch tell her not to use the phone? Why wouldn't dispatch refer the call to the watch commander?*

   (b) Page 8, "She was inquiring about a juvenile that had been arrested (sic) by Officer Whitney earlier that day."

   (c) Page 12, "Well, I know that I went out there and talked to her."

   (d) Page 13, "The conversation resulted in her refusing to make a complaint, refusing to take the form, and *having to be removed from the station.*"

   (e) Page 13, *"And myself and at least one other officer had to remove her from the station."*

   (f) Page 15, Officer Kevin McCarthy assisted him in removing Mrs. Salvatto.

   (g) Page 16, *"Well, eventually, as I stated, she was in the threshold, and Officer McCarthy grabbed her on the shoulder or, I don't remember, of her body somewhere, and pushed her out of the building."*

   (h) Page 18, "She insisted that she wanted to make a complaint again. I tried to explain the process to her. And I offered to send her a form in the mail that she could fill out. And she insisted that she wanted to come down and talk again about the arrest (sic) of her son. That was the last contact I remember having with her." *Why didn't he (Liddicoet) just file the complaint?*

   (i) Page 19, "I since learned that it's not her son."

   (j) Page 21, *"Detention you have reasonable cause to detain, and arrest you have probable cause to arrest." Liddicoet does not, apparently, know that "reasonable cause" and "probable cause" are exactly the same. He should know that, and he should know that all that is necessary to detain is "reasonable suspicion". (Opinion)*

   (k) Page 23, he is not sure there is a written policy with regard to the use of the outside telephone. *There should be such a policy, in writing. (Opinion)*

   (l) Page 30, "Well, she was refusing to follow my orders to leave the lobby. She was increasingly yelling and screaming. She wouldn't listen to anything I was saying, including my orders to leave the lobby."

   (m) Page 33, he was going off duty and Sergeant Schroeder was coming on duty, so he briefed Schroeder because he thought Mrs. Salvatto may return."

(n) Page 36, *he had told her she was in violation of Penal Code Section 148.*

(o) Page 41, *"Because she would not leave it was a lawful use of force." That is not a reasonable of force. (Opinion)*

4. Deposition of William Brett Clark.

   (a) Page 7, "I was contacted by the acting Watch Commander at that time who was Sergeant Kelly Schroeder, and he informed me that Mrs. Salvatto was outside the police building repeatedly calling down to Dispatch Center. And she had already been assisted by two Watch Commanders, and it was time for her to leave and she was refusing to leave."

   (b) Page 11, "Yes, she was arrested for 602.1 (b) of the Penal Code."

   (c) Page 16, "The public has access to the Police Department 24 hours a day, 7 days a week. The only part of the police station that's closed is the lobby. And the reason it's closed is because we have no personnel to man it. So they have to conduct their business through contacting Communications Center or the Watch Commander or patrol supervisor."

   (d) Page 17, "It was my understanding that she had been *at the Police Department for four hours.* She had been asked to leave and she had been escorted out of the building and that *she had called the Communications Center approximately 25 times within an hour.*"

   (e) Page 18, "Probably around 1930 hours that date, as soon as we broke roll call, the Watch Commander asked me to speak with her and see if I could encourage her to leave."

   (f) Page 18, "I *assumed* that she had been at the station for four hours based on what I was told by the Watch Commander."

   (g) Pages 18-19, "She was the only person *standing on the front steps of the police station. She was standing next to the public access phone for the in-house contacts and Communications Center.*"

   (h) Page 19, "I informed her that *I was very aware of what occurred* and *she needed to leave the building,* she had been here a long time." He thought she had been there for four (4) hours? *"She needed to leave the building", she was outside?*

   (i) Page 21, "A fella by the name of Jamal Thrower had received a ticket, and he is no relation to Ms. Salvatto."

   (j) Page 21, "I learned that probably six months after the case, maybe." *When did Mrs. Salvatto become Jamal Throwers legal guardian? Foster child?*

6

(k) Page 25, "If you were a business owner and some was panhandling in front of your business, I would ask you if you wanted to place them under citizen's arrest for interfering with your business."

(l) Page 27, "The Watch Commander said that they had to escort her outside the building because she was refusing to leave. And the she was on the telephone to the Communications Center making repeated phone calls to the Communications Center. They asked me to go make contact with her and encourage her to leave."

(m) Page 28, *"I made the determination that Ms. Salvatto committed a crime and I made the decision to arrest her."*

(n) Pages 32-33, with regard to what Dispatch Center employee Mary Ramos told him, "She explained to me that she had received approximately *16 phone calls from Ms. Salvatto within the last hour, and all of the phone calls were coming from the courtesy phone in the front of the police station.* She was claiming that she wanted to make a complaint against an officer. The dispatcher informed her that she needed to do that through the Watch Commander, she demanded to talk with another officer, and that wasn't going to happen."

(o) Page 35, "A report number is generated when there is a crime report authored or there is an informational report authored or there is an arrest report authored. A CAD number is generated anytime somebody calls the police department and reports something."

(p) Page 36, "She said approximately 16 within an hour's period of time. That's extremely excessive. And that's borderline nuisance phone calls. If somebody called your house 16 times in an hour you would be calling the police wanting that person arrested."

(q) Page 37, Dispatcher Barden said she had received 5-6 phone calls from Ms. Salvatto.

(r) Page 42, *the population of Vallejo is 120,000.*

(s) Page 42, " - - - - , she was standing out front, she was standing next to the courtesy phone, which is to the left of the door as you go outside. I asked how I could help her.

She explained to me that *she wanted to file a complaint* with the Police Department *regarding her son being arrested." If that is what Ms. Salvatto wanted, there was no basis for a crime report. She could file a Citizen's Complaint, although such a complaint would be without merit, unless Jamal Thrower had made some other allegation with regard to his being taken into custody. (Opinion)*

(t) Page 50, with regard to what Clark told Ms. Salvatto, *"If you don't leave, you will be arrested. You are interfering with our ability to conduct our investigations and do our work."*

7

(u) Page 51, "I counted down, I got to the ending number. She said, "You might as well just arrest me.""

(v) Page 52, *"Then she began to resist by stiffening up her arms and moving her shoulders away from us."*

(w) Page 52, "Her arms were stiff and she was moving her shoulders about to free her arms."

(x) Page 54, *she was <u>outside on the steps</u> when she was arrested and handcuffed.*

(y) Page 77, there is a video camera focusing on the courtesy phone, but it dos not record.

(z) Page 84, "When I restrained Ms. Salvatto she was on the landing proper, - - - - ."

(aa) Page 91, there is a difference between filing a criminal complaint against an officer and filing a "Citizen's Complaint". *The difference is the type of report filed. Clark states there is no difference; that is incorrect. (Opinion)*

(bb) Page 94, *Clark states that it is not his job to document a complaint by Ms. Salvatto; that is, technically, incorrect. (Opinion)*

5. Expert Opinion Report, Jared I. Zwickey (12 pages).

(a) Page 1, Paragraph D, "The City of Lodi employs me as a Level I peace officer. My duties include, but are not limited to patrol duties in the City of Lodi." *That statement would indicate that Mr. Zwickey is a Reserve Police Officer with the City of Lodi. That is not a full time, fully compensated sworn officer position. Although, Mr. Zwickey's statement is true, it is, potentially, misleading. There is no such thing as a "Level I", full time, fully compensated peace officer. He should have included that he is a Reserve Officer.* See Penal Code Section 832.6:

*PC§ 832.6.        Reserve Officer Levels*

(a)    Every person deputized or appointed, as described in subdivision (a) of Section 830.6, shall have the powers of a peace officer only when the person is any of the following:

(1)    A level I reserve officer deputized or appointed pursuant to paragraph (1) or (2) of subdivision (a) or subdivision (b) of Section 830.6 and assigned to the prevention and detection of crime and the general enforcement of the laws of this state, whether or not working alone, and the person has completed the basic training course for deputy sheriffs and police officers prescribed by the Commission on Peace Officer Standards and Training. For level I reserve officers appointed prior to January 1, 1997, the basic training requirement shall be the course that was prescribed at the time of their appointment. Reserve officers appointed pursuant to this paragraph shall satisfy the continuing professional training requirement prescribed by the commission.

8

(2)   A level II reserve officer assigned to the prevention and detection of crime and the general enforcement of the laws of this state while under the immediate supervision of a peace officer who has completed the basic training course for deputy sheriffs and police officers prescribed by the Commission on Peace Officer Standards and Training, and the level II reserve officer has completed the course required by Section 832 and any other training prescribed by the commission.

Level II reserve officers appointed pursuant to this paragraph may be assigned, without immediate supervision, to those limited duties that are authorized for level III reserve officers pursuant to paragraph (3). Reserve officers appointed pursuant to this paragraph shall satisfy the continuing professional training requirement prescribed by the commission.

(3)   Level III reserve officers may be deployed and are authorized only to carry out limited support duties not requiring general law enforcement powers in their routine performance. Those limited duties shall include traffic control, security at parades and sporting events, report taking, evidence transportation, parking enforcement, and other duties that are not likely to result in physical arrests. Level III reserve officers while assigned these duties shall be supervised in the accessible vicinity by a level I reserve officer or a full-time, regular peace officer employed by a law enforcement agency authorized to have reserve officers. Level III reserve officers may transport prisoners without immediate supervision. Those persons shall have completed the training required under Section 832 and any other training prescribed by the commission for those persons.

(4)   A person assigned to the prevention and detection of a particular crime or crimes or to the detection or apprehension of a particular individual or individuals while working under the supervision of a California peace officer in a county adjacent to the state border who possesses a basic certificate issued by the Commission on Peace Officer Standards and Training, and the person is a law enforcement officer who is regularly employed by a local or state law enforcement agency in an adjoining state and has completed the basic training required for peace officers in his or her state.

(5)   For purposes of this section, a reserve officer who has previously satisfied the training requirements pursuant to this section, and has served as a level I or II reserve officer within the three-year period prior to the date of a new appointment shall be deemed to remain qualified as to the Commission on Peace Officer Standards and Training requirements if that reserve officer accepts a new appointment at the same or lower level with another law enforcement agency. If the reserve officer has more than a three-year break in service, he or she shall satisfy current training requirements.

This training shall fully satisfy any other training requirements required by law, including those specified in Section 832.

9

In no case shall a peace officer of an adjoining state provide services within a California jurisdiction during any period in which the regular law enforcement agency of the jurisdiction is involved in a labor dispute.

(b)     Notwithstanding subdivision (a), a person who is issued a level I reserve officer certificate before January 1, 1981, shall have the full powers and duties of a peace officer as provided by Section 830.1 if so designated by local ordinance or, if the local agency is not authorized to act by ordinance, by resolution, either individually or by class, if the appointing authority determines the person is qualified to perform general law enforcement duties by reason of the person's training and experience. Persons who were qualified to be issued the level I reserve officer certificate before January 1, 1981, and who state in writing under penalty of perjury that they applied for but were not issued the certificate before January 1, 1981, may be issued the certificate before July 1, 1984. For purposes of this section, certificates so issued shall be deemed to have the full force and effect of any level I reserve officer certificate issued prior to January 1, 1981.

(c)     In carrying out this section, the commission:

(1)     May use proficiency testing to satisfy reserve training standards.

(2)     Shall provide for convenient training to remote areas in the state.

(3)     Shall establish a professional certificate for reserve officers as defined in paragraph (1) of subdivision (a) and may establish a professional certificate for reserve officers as defined in paragraphs (2) and (3) of subdivision (a).

(4)     Shall facilitate the voluntary transition of reserve officers to regular officers with no unnecessary redundancy between the training required for level I and level II reserve officers.

(d)     In carrying out paragraphs (1) and (3) of subdivision (c), the commission may establish and levy appropriate fees, provided the fees do not exceed the cost for administering the respective services. These fees shall be deposited in the Peace Officers' Training Fund established by Section 13520.

(e)     The commission shall include an amount in its annual budget request to carry out this section.

(Amended by Stats. 2001, Ch. 473, Sec. 6. Effective January 1, 2002.)
(Amended by Stats. 2000, Ch. 287, Sec. 11. Effective January 1, 2001.)
(Amended by Stats. 1999, Ch. 111, Sec. 1. Effective July 13, 1999.)
(Amended by Stats. 1998, Ch. 190, Sec. 3. Effective January 1, 1999.)

(b) Page 4, Paragraph M, "A reasonably well trained peace officer would have believed that there was probable cause to arrest the plaintiff for willfully resisting peace officers in the discharge of their duties, for interfering with the lawful business of the police department, *and for the unlawful use of a telephone or electronic communications*

10

*device." "And for the unlawful use of a telephone or electronic communications device" is incorrect. There was no such violation. (Opinion)*

(c) Page 5, Paragraph 8, "After a very lengthy discussion and with the assistance of Officer McCarthy, Lieutenant Liddicoet escorted the plaintiff out of the police lobby. The plaintiff was briefly pushed forward over the threshold of the sliding glass doors where she remained outside the police building. The force to push on her arms to move her body was minimal and reasonable to remove her from the facility."

(d) Page 6, Paragraph 9, "Probable cause to detain and arrest is based on a set of facts that would cause a person of ordinary care and prudence to entertain an honest and strong belief that the person to be stopped and searched may be in possession of contraband." *What is Zwickey talking about? This statement has no application to this case. (Opinion)*

*(e) Pages 6 & 7, Paragraphs 10-12, these are superfluous and have remote application to this case. (Opinion)*

(f) Page 7, Paragraph 13, "The plaintiff told Sergeant Schroeder that she felt that Officer McCarthy battered her while talking to him and Lieutenant Liddicoet. She stated she wanted to file a complaint against him."

(g) Page 7, Paragraph 15, "The plaintiff eventually left the lobby without force."

(h) Page 7, Paragraph 16, "Several minutes after the dispatch center contacted Sergeant Schroeder advising that the plaintiff was now calling on the courtesy phone again, demanding that someone come and take a criminal police report against Officer McCarthy."

(i) Page 8, Paragraph 19, "When the plaintiff refused to accept Sergeant Clark's recommendations, she demanded that a criminal complaint be file against *Corporal Whitney." Does Zwickey mean Officer McCarthy? There was no basis for a criminal complaint being filed against Corporal Whitney.*

(j) Page 8, Paragraph 19, "When it became apparent that the plaintiff was not going to comply with Sergeant Clark's instructions, the plaintiff was placed under arrest."

(k) Page 8, Paragraph 21, "Based on the totality of the facts and circumstances, it was reasonable to arrest the plaintiff for *various penal code violations*, and to transport her to a holding facility." *What were the "various penal code violations"?*

(l) Page 10, Paragraph 8, "The defendant's selection of the force used to control the plaintiff was based on their reasonable belief that the plaintiff had committed a crime of possession of illegal drugs. The plaintiff was actively resisting by evading arrest by running away from the defendants, and he committed a battery and an assault on the officers as they attempted to take him into custody." *What is Zwickey talking about? This paragraph has absolutely no application to this case.*

11

(m) Page 10, Paragraph 10, "The plaintiff's willful and unreasonable actions of repeatedly calling the dispatch center telephone to air her complaints, and her failure to leave the premises after she was warned that failure to obey a lawful order, constituted a criminal act." *There is no such crime of "failing to obey a lawful order" under the circumstances of this case. (Opinion)*

6. Complaint (12 pages) for Violation of Civil Rights; False Arrest; Assault and Battery; Abuse of Process, Negligence: Loss of - - - - .

    (a) Page 3, Plaintiff arrived at the Vallejo Police Department at approximately 5:30 P.M. Jamal Thrower was present at this time.

    (b) Page 3, the police lobby closed at 7:00 P.M.?

    (c) Page 4, " - - - - , one of the officers *stomped* on the Plaintiff LATEACHEEAH G. ANDERSON SALVATTO'S foot *breaking it*."

7. Vallejo Police Department Crime Report # 03-303 (7 pages including Attachments), charging 602.1 (b), dated 01/05/03, filed by B. Clark #436.

    (a) Page 1, Time of Occurrence: 1940 hours.

8. Incident at Vallejo Police Headquarters, Sunday January 5, 2000, Affirmed Statement of LaTeacheeah G. Anderson Salvatto (14 pages).

    (a) Page 1, with regard to Jamal, "I asked them could I call home and they wouldn't let me." *If that is true, Jamal should have been allowed to call home. In fact, Corporal Whitney should have made the call. (Opinion)*

    (b) Page 4, "You need to step outside" the commander insisted and again looked at the other officer, the other officer stepped toward me and *pushed me toward the door with his elbow*, I put my hands up and motioned to the officer to stop, I was afraid and I told him, "Please officer you don't; have a right to touch me, if I did that to you, you would charge with assault. Will you please step back you're scaring me."

    (c) Page 5, "My feet were planted somewhat firmly; the officer noticed this and moved in closer and *placed his knee upon the side of my thigh and kick (sic) my right foot with his shoe/boot. I was knocked off balance and the officer continued to push me out of the building.*"

    (d) Page 6, Salvatto is alleging that Corporal Whitney spoke to her *after* she had been pushed out of the door.

    (e) Page 10, *Salvatto alleges that she was taken into custody while standing by her vehicle, and after the officer examined her tape-recorder.*

9. Declaration of Aimee Knight (2 pages).

(a) Preserved the audio recordings of telephone calls made by Mrs. Salvatto via the the Vallejo Police Department exterior courtesy telephone.

10. Exhibit "A", Vallejo Police Department Transcript Excerpt (7 pages) from Digital Recording System, telephone call from of LaTeacheeah Salvatto.

(a) Page 4, this appears to be subsequent to her forced removal from the police department.

(b) This appears to be the transcript for six (6) telephone calls.

11. Ms. Salvatto *did not* violate *Penal Code Section 653m, Annoying Electronic Communication. (Opinion)*

12. *Ms. Salvatto should not have been removed by force from the police lobby unless she was being arrested. (Opinion)*

13. *Ms. Salvatto should not have been arrested while in a public place, outside the police department facility. There was, at that time, no violation of Penal Code Section 602.1, "Interfering with Business Operation". (Opinion)*

14. The following are excerpts from the California Penal Code:

### PC§ 148.  Resist, Obstruct, Delay of Peace Officer or EMT

(a) (1) Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, as defined in Division 2.5 (commencing with Section 1797) of the Health and Safety Code, in the discharge or attempt to discharge *any duty* of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

(Amended by Stats. 1999, Ch. 853, Sec. 8. Effective January 1, 2000.)
(Amended by Stats. 1997, Ch. 464, Sec. 1. Effective January 1, 1998.)

### PC§ 602.1.  Interfering with Business Operation

(a)     Any person who intentionally interferes with any lawful business or occupation carried on by the owner or agent of a business establishment *open to the public*, by *obstructing or intimidating* those attempting to carry on business, or their customers, and *who refuses to leave the premises of the business establishment after being requested to leave by the owner or the owner's agent, or by a peace officer acting at the request of the owner or owner's agent*, is guilty of a misdemeanor, punishable by imprisonment in a county jail for up to 90 days, or by a fine of up to four hundred dollars ($400), or by both that imprisonment and fine.

(b)     *Any person who intentionally interferes with any lawful business carried on by the employees of a public agency open to the public, by obstructing or intimidating*

13

*those attempting to carry on business, or those persons there to transact business with the public agency*, and who refuses to leave the premises of the public agency after being requested to leave by the office manager or a supervisor of the public agency, or by a peace officer acting at the request of the office manager or a supervisor of the public agency, is guilty of a misdemeanor, punishable by imprisonment in a county jail for up to 90 days, or by a fine of up to four hundred dollars ($400), or by both that imprisonment and fine.

(c)     This section shall not apply to any of the following persons:

(1)     Any person engaged in lawful labor union activities that are permitted to be carried out on the property by state or federal law.

(2)     Any person on the premises who is engaging in activities protected by the California Constitution or the United States Constitution.

(d)     Nothing in this section shall be deemed to supersede the application of any other law.

(Amended by Stats. 1994, Ch. 820, Sec. 3. Effective January 1, 1995.)

### *PC§ 653m.     Annoying Electronic Communication*

(a)     Every person who, with intent to annoy, telephones or makes contact by means of an electronic communication device with another and addresses to or about the other person any obscene language or addresses to the other person any threat to inflict injury to the person or property of the person addressed or any member of his or her family, is guilty of a misdemeanor. Nothing in this subdivision shall apply to telephone calls or electronic contacts made in good faith.

(b)     Every person who makes repeated telephone calls or makes repeated contact by means of an electronic communication device with intent to annoy another person at his or her residence, is, whether or not conversation ensues from making the telephone call or electronic contact, guilty of a misdemeanor. Nothing in this subdivision shall apply to telephone calls or electronic contacts made in good faith.

(c)     Every person who makes repeated telephone calls or makes repeated contact by means of an electronic communication device with the intent to annoy another person at his or her place of work is guilty of a misdemeanor punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment in a county jail for not more than one year, or by both that fine and imprisonment. Nothing in this subdivision shall apply to telephone calls or electronic contacts made in good faith. This subdivision applies only if one or both of the following circumstances exist:

(1)     There is a temporary restraining order, an injunction, or any other court order, or any combination of these court orders, in effect prohibiting the behavior described in this section.

14

(2)    The person makes repeated telephone calls or makes repeated contact by means of an electronic communication device with the intent to annoy another person at his or her place of work, totaling more than 10 times in a 24-hour period, whether or not conversation ensues from making the telephone call or electronic contact, and the repeated telephone calls or electronic contacts are made to the workplace of an adult or fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the person has a child or has had a dating or engagement relationship or is having a dating or engagement relationship.

(d)    Any offense committed by use of a telephone may be deemed to have been committed where the telephone call or calls were made or received. Any offense committed by use of an electronic communication device or medium, including the Internet, may be deemed to have been committed when the electronic communication or communications were originally sent or first viewed by the recipient.

(e)    Subdivision (a), (b), or (c) is violated when the person acting with intent to annoy makes a telephone call requesting a return call and performs the acts prohibited under subdivision (a), (b), or (c) upon receiving the return call.

(f)    If probation is granted, or the execution or imposition of sentence is suspended, for any person convicted under this section, the court may order as a condition of probation that the person participate in counseling.

(g)    For purposes of this section, the term "electronic communication device" includes, but is not limited to, telephones, cellular phones, computers, video recorders, fax machines, or pagers. "Electronic communication" has the same meaning as the term defined in Subsection 12 of Section 2510 of Title 18 of the United States Code.

(Amended by Stats. 1999, Ch. 83, Sec. 147. Effective January 1, 2000.)
(Amended by Stats. 1998, Ch. 826, Sec. 2. Effective January 1, 1999.)

## *PC§ 832.5.    Citizen Complaints*

(a)    Each department or agency in this state that employs peace officers shall establish a procedure to investigate complaints by members of the public against the personnel of these departments or agencies, and shall make a written description of the procedure available to the public.

(b)    Complaints and any reports or findings relating to these complaints shall be retained for a period of at least five years. All complaints retained pursuant to this subdivision may be maintained either in the officer's general personnel file or in a separate file designated by the department or agency as provided by department or agency policy, in accordance with all applicable requirements of law. However, prior to any official determination regarding promotion, transfer, or disciplinary action by an officer's employing department or agency, the complaints described by subdivision (c) shall be removed from the officer's general personnel file and placed in separate file designated by the department or agency, in accordance with all applicable requirements of law.

15

(c)     Complaints by members of the public that are determined by the peace officer's employing agency to be frivolous, as defined in Section 128.5 of the Code of Civil Procedure, or unfounded or exonerated, or any portion of a complaint that is determined to be frivolous, unfounded, or exonerated, shall not be maintained in that officer's general personnel file. However, these complaints shall be retained in other, separate files that shall be deemed personnel records for purposes of the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code) and Section 1043 of the Evidence Code.

(1)     Management of the peace officer's employing agency shall have access to the files described in this subdivision.

(2)     Management of the peace officer's employing agency shall not use the complaints contained in these separate files for punitive or promotional purposes except as permitted by subdivision (f) of Section 3304 of the Government Code.

(3)     Management of the peace officer's employing agency may identify any officer who is subject to the complaints maintained in these files which require counseling or additional training. However, if a complaint is removed from the officer's personnel file, any reference in the personnel file to the complaint or to a separate file shall be deleted.

(d)     As used in this section, the following definitions apply:

(1)     "General personnel file" means the file maintained by the agency containing the primary records specific to each officer's employment, including evaluations, assignments, status changes, and imposed discipline.

(2)     "Unfounded" means that the investigation clearly established that the allegation is not true.

(3)     "Exonerated" means that the investigation clearly established that the actions of the peace officer that formed the basis for the complaint are not violations of law or department policy.

(Amended by Stats. 1998, Ch. 25, Sec. 1. Effective January 1, 1999.)

15. The following are excerpts from the California Welfare & Institutions Code:

### WI§ 602.  *Violation of Law by Minor; Juvenile Court Jurisdiction*

(a)     Except as provided in subdivision (b), any person who is under the age of 18 years when he or she violates any law of this state or of the United States or any ordinance of any city or county of this state defining crime other than an ordinance establishing a curfew based solely on age, is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court.

(Amended by Stats. 2001, SB 205, Ch. 854, Sec. 72.)
(Added by Proposition 21, Approved by Voters March 7, 2000)
(Amended by Stats. 1999, SB 334, Ch. 996, Sec. 12.2 Effective October 10, 1999)

16

### *WI§ 626. Officer Actions upon Temporary Detention*

An officer who takes a minor into temporary custody under the provisions of Section 625 may do any of the following:

(a)        Release the minor.

(b)        Deliver or refer the minor to a public or private agency with which the city or county has an agreement or plan to provide shelter care, counseling, or diversion services to minors so delivered.

(c)        Prepare in duplicate a written notice to appear before the probation officer of the county in which the minor was taken into custody at a time and place specified in the notice. The notice shall also contain a concise statement of the reasons the minor was taken into custody. The officer shall deliver one copy of the notice to the minor or to a parent, guardian, or responsible relative of the minor and may require the minor or the minor's parent, guardian, or relative, or both, to sign a written promise to appear at the time and place designated in the notice. Upon the execution of the promise to appear, the officer shall immediately release the minor. The officer shall, as soon as practicable, file one copy of the notice with the probation officer. The written notice to appear may require that the minor be fingerprinted, photographed, or both, upon the minor's appearance before the probation officer, if the minor is a person described in Section 602 and he or she was taken into custody upon reasonable cause for the commission of a felony.

(d)        Take the minor without unnecessary delay before the probation officer of the county in which the minor was taken into custody, or in which the minor resides, or in which the acts take place or the circumstances exist which are alleged to bring the minor within the provisions of Section 601 or 602, and deliver the custody of the minor to the probation officer. The peace officer shall prepare a concise written statement of the probable cause for taking the minor into temporary custody and the reasons the minor was taken into custody and shall provide the statement to the probation officer at the time the minor is delivered to the probation officer. In no case shall the officer delay the delivery of the minor to the probation officer for more than 24 hours if the minor has been taken into custody without a warrant on the belief that the minor has committed a misdemeanor.

In determining which disposition of the minor to make, the officer shall prefer the alternative which least restricts the minor's freedom of movement, provided that alternative is compatible with the best interests of the minor and the community.

(Amended by Stats. 2001, AB 701, Ch. 334, Sec. 1.)

### *WI§ 627. Officer Notice to Parent When Taking Minor to Juvenile Hall*

(a)        When an officer takes a minor before a probation officer at a juvenile hall or *to any other place of confinement pursuant to this article,* he shall take immediate steps to notify the minor's parent, guardian, or a responsible relative that such minor is in custody and the place where he is being held.

17

(b)    Immediately after being taken to a place of confinement pursuant to this article and, except where physically impossible, *no later than one hour after he has been taken into custody, the minor shall be advised and has the right to make at least two telephone calls from the place where he is being held, one call completed to his parent or guardian, a responsible relative, or his employer, and another call completed to an attorney.* The calls shall be at public expense, if the calls are completed to telephone numbers within the local calling area, and in the presence of a public officer or employee. Any public officer or employee who willfully deprives a minor taken into custody of his right to make such telephone calls is guilty of a misdemeanor.    7.

\*\*\*\*\*

My qualifications to render these opinions are:

## EDUCATION & CREDENTIALS

| | |
|---|---|
| Stanford University, Palo Alto, California | |
| Continuing Studies Program | 1999-2001 |
| California State University at Los Angeles | |
| Master of Science, Criminal Justice | 1971-76 |
| California State College at Los Angeles | |
| Bachelor of Science, Police Science & Administration | 1967-70 |
| Compton College, Compton, California | |
| Associate of Arts | 1959-67 |
| Compton College, Compton, California | |
| Traffic Control | 1966 |
| Compton College, Compton, California | |
| Vehicle Code | 1966 |
| California State College at Los Angeles | |
| Traffic Supervision | 1968 |
| California State Department of Education, Bureau of Industrial Education | |
| Techniques of Teaching | 1976 |
| State of California, Commission for Teacher Preparation and Licensing | |
| Designated Subjects (Ryan) Teaching Credential | 1977-82 |
| California Community Colleges Instructor Credential | |
| Subject Matter Area: Police Science (valid for life) | 1977 |

18

| | | |
|---|---|---|
| Instructor – Long Beach Police Department/Long Beach City College | | |
| Training Officer Seminar, "Report Review Problem Areas" | | 1977-79 |
| Recruit Academy, "Vice Investigations" | | 1982-85 |
| Recruit Academy, "Disturbance Calls" | | 1979-80 |
| | | |
| California Specialized Training Institute, San Luis Obispo, California | | |
| Emergency Management-Earthquake | | 1988 |
| Disaster Damage Assessment | | 1988 |
| | | |
| Federal Bureau of Investigation | | |
| Critical Incident Management and Tactics | | 1988 |
| | | |
| Michigan State University, East Lansing, Michigan | | |
| "Conference on Community Policing & Drugs", Presenter/Panelist, | | |
| "Drug Sales: Providing a Sustained Police Presence" | 1990 | |
| | | |
| California Commission on Peace Officer Standards & Training | | |
| Executive Development Course | | 1987 |
| Commander Course (Vice, Narcotics & Intelligence) | 1984 | |
| Middle Management Course | | 1982 |
| Sergeant Supervisory Course | | 1976 |
| Los Angeles County Sheriff's Academy | | 1961 |
| | | |
| California Commission on Peace Officer Standards & Training - Certificates | | |
| Basic | | 1962 |
| Intermediate | | 1968 |
| Advanced | | 1968 |
| Supervisory | | 1981 |
| Management | | 1983 |
| | | |
| Long Beach Police Officers' Association | | 1980-82 |
| Member of Board of Directors | | |
| | | |
| California Peace Officers' Association | | |
| Chairman - Police Community Relations Committee | 1990-91 | |
| Police Pursuits - Ventura County Sheriff's Department | | 1996 |
| | | |
| Long Beach Police Department | | |
| Sergeant/Civilian Supervisor Course | | 1981 |
| | | |
| Long Beach Police Department | | |
| Ethics and Integrity Training (P.O.S.T.) | | 1989 |
| | | |
| Long Beach Police Department | | |
| Verbal Judo – Command Staff | | 1990 |

19

Los Angeles Police Department
    Threat Management Conference - Disneyland Hotel
    Anaheim, California                                                        1993

California Peace Officers' Association
    Police Pursuits - Ventura County Sheriff's Department                 1996
    Chairman - Police Community Relations Committee               1990-91

American Society for Industrial Security
    Physical Security - Crowne Plaza Hotel, Redondo Beach, California         1997

Certificate of Fitness (License to Consult) - Fire/Life Safety/High-Rise Buildings
    City of Los Angeles Fire Department – Not renewed                     1998

California Judges Association - The Rutter Group
    Use and Abuse of Expert Witnesses - The Hyatt Regency Hotel, Irvine, CA     1998

Certified Protection Professional (CPP) - American Society for Industrial Security
    Valid 1995 through 12-31-2003

Security Services Survey – Epson America
    Torrance, California                                                          1995

Police Response to Violence in the Workplace – Seminar Presenter
    World Trade Center, Long Beach, California                                 1995

Security Services Survey – Chevron Corporation, El Segundo, California            1996

Security Services Survey – World Trade Center, Long Beach, California               1997

Security Officer and the Law Training – Instructor – American Protective Services     1992-98

Security Officer and the Law Training – Instructor – The Macerich Company          1998-99

Security Investigations – Instructor – American Protective Services
    Fremont, California                                                           1998

American Society for Industrial Security
    Professional Investigations - Crowne Plaza Hotel, Redondo Beach            1999

American Society for Industrial Security/Los Angeles Police Department
    LEAPS Conference 2000 – Security-Police Partnership                     2000

American Society for Industrial Security/Los Angeles Police Department
    LEAPS Conference 2001 – Security-Police Partnership                     2001

Consultant, ABS Consulting, Risk Consulting Division, Assessment Proposal

| | |
|---|---|
| Port of Long Beach, Harbor Department, Security Division | 2002 |
| S.E.A.K. / F.E.W.A. 2005 Expert Witness Pre-Conference/Summit, Attendee<br>Sutton Place Hotel, Newport Beach, California | 2005 |
| S.E.A.K. / F.E.W.A. 2005 Expert Witness Pre-Conference/Summit, Speaker,<br>"Dealing with Counsel, How Not to Get Burned"<br>Sutton Place Hotel, Newport Beach, California | 2005 |

## CONSULTANT/EXPERT WITNESS

1. Consultant/Expert (P), Police Practices (Vehicle Pursuit), *Deposition/Trial Testimony*, *Tomlinson v. City of Long Beach*, Los Angeles County Superior Court, **1994-95**; Verdict: $15,000,000 gross, Affirmed -Court of Appeal, Second Appellate District, Division Seven, March 11, 1997

2. Consultant/Expert (P), Police Practices (Police Vehicle Operations), *Deposition Testimony*, *Powers v. City of Carlsbad*, San Diego County Superior Court, **1996**; Settlement: $1,700,000 including an annuity for the plaintiff with a guaranteed pay-out of $3,610,436 and an expected pay-out of $9,130,933

3. Consultant/Expert (P), Police Practices (Use of Force), *Deposition/Trial Testimony*, *Johnson v. City of Long Beach*, United States District Court, Central District of California, **1996**; Hung Jury 6-3 (Plaintiff), Settlement

4. Consultant/Expert (P), Police Practices (Police Conduct - Suicidal Person), *Jensen v. City of San Diego,* San Diego County Superior Court, **1996**, Dismissal by Plaintiff

5. Consultant/Expert (P), Police Practices (Vehicle Pursuit), *Deposition Testimony*, *Pierce v. City of Cathedral City,* Riverside County Superior Court, **1996**, Settlement

6. Consultant (P), Police Practices (Probable Cause, Execution of Search Warrants), *Fragale v. City of El Segundo, et al.*, Los Angeles County Superior Court, **1997**

7. Consultant/Expert (P), Police Practices (Search/Body Fluids), *Deposition Testimony*, *Vancleave v. City of Glendale, et al*, United States District Court, Central District of California, **1997**, Settlement

8. Consultant (D), Police Practices (Detention/Arrest/Use of Force), *People v. Loomis*, Los Angeles County Municipal Court, **1997**, Jury Conviction, *Declined*

9. Consultant/Expert (P), Police Practices (Police Vehicle Operations), *Deposition Testimony*, *Metzler v. Asphalt Construction, et al.*, Los Angeles County Superior Court, North District, **1997**, Settlement

10. Consultant/Expert (P), Police Practices (Use/Investigation of Deadly Force), *Deposition/Trial Testimony, Buck v. City of Long Beach, Los Angeles County Superior Court, 1997, Defense Verdict*

11. Consultant/Expert (P), Police Practices (Misconduct, Corruption), *Joseph v. City of Long Beach, et al, United States District Court, Central District of California, 1997, Settlement ($57,500)*

12. Consultant/Expert (P), Police Practices (Detention/Arrest/Probable Cause/Misconduct), *Deposition Testimony, Jacobson v. City of Los Angeles, Los Angeles County Superior Court, 1997, Defense/Plaintiff Verdicts*

13. Consultant/Expert (P), Police Practices (Vehicle Pursuit), Declaration, *Deposition Testimony, Magdaleno v. City of Fountain Valley, et al.*, Orange County Superior Court, 1997, Settlement ($750,000)

14. Consultant/Expert (D), Police Practices (Arrest/Probable Cause/Controlled Substance), *People v. Tovar*, Los Angeles County Superior Court, 1997, Plea Bargain

15. Consultant/Expert (P), Police Practices (Arrest/Probable Cause/Terrorist Threats), *Declaration, Hargreaves v. Robert Half International, Inc., et al.,* Los Angeles County Superior Court, 1997

16. Consultant/Expert (P), Police Practices (Arrest/Probable Cause/Public Intoxication), *Deposition/Trial Testimony, Andy Tran v. City of Anaheim*, United States District Court, Central District of California, 1997, Defense Verdict

17. Consultant (P), Police Practices (Arrest/Mentally Disturbed Person/Use of Deadly Force), Declaration, *Margaret Munoz, et al. v. City of San Bernardino, et al., 1997, Dismissal (Plaintiff)*

18. Consultant (P), Threat Management (Wrongful Death), *Declaration, Ji & Liu v. Peng & Peng,* United States District Court, Central District of California, 1998

19. Consultant/Expert (P), Police Practices (Use/Investigation of Deadly Force), *Krone Tremain v. City of Long Beach*, Los Angeles County Superior Court, 1998, Dismissal

20. Consultant/Expert (P), Police Practices (Use of Deadly Force), **Declaration**, *Maria Hernandez, et al. v. City of Huron*, et al., United States District Court, Eastern District of California, 1998, Settlement, $530,000

21. Consultant/Expert (P), Police Practices (Probable Cause, Execution of Search Warrants), *Deposition/Trial Testimony, Tony Nammari, et al. v. City of Huntington Beach*, Orange County Superior Court, 1998, Defense Verdict

22. Consultant/Expert (P), School Security Practices (Reporting/Investigation of Child Abduction), *Deposition/Trial Testimony, Morse v. La Mesa Spring Valley School District, et al.*, San Diego County Superior Court, 1998, Plaintiff Verdict

22

23. Consultant/Expert (P), Police Practices (False Arrest/Civil Dispute Handling/Misconduct), *Eli K. Mellor, THE TIME IS NOW GROUP v. Ralph Dean, City of Claremont, et al.,* United States District Court, Central District of California, **1998**, Settlement

24. Consultant (P), Police Practices (Arrest Procedures/Firearms Procedures/Use of Deadly Force), *Cardell Grays v. City of Modesto*, et al., United States District Court, Eastern District of California, **1998**, Settlement

25. Consultant/Expert (P), School Security Practices (Use of Force), ***Deposition/Evidence Code 402/Trial Testimony***, *Jose Urtez v. Compton Unified School District*, et al., Los Angeles County Superior Court, **1998**, Hung Jury (6-6), Settlement

26. Consultant/Expert (P), Police Practices (Detention/Arrest/Probable Cause/Use of Force/Misconduct), *Gary Jackson v. K. S. Tripp, et al.,* United States District Court, Central District of California, **1998**, Settlement

27. Consultant (P), Police Practices (Detention/Probable Cause/Search and Seizure /Misconduct), *Ryan Huntsman v. Newport Beach Police Department, et al.,* United States District Court, Central District of California, **1998**, Settlement

28. Consultant/Expert (P), Police Practices (Personnel Practices/Negligent Hiring/Retention/Failure to Discipline/Misconduct), ***Deposition/Evidence Code 402/Trial Testimony***, *Benjamin Chavarria v. City of Gonzales, et al.,* Monterey County Superior Court, **1998**, Non-suit

29. Consultant/Expert (P), Police Practices (Detention/Arrest/Probable Cause/Use of Force/Misconduct), *Adam Jacek Jawien v. City of Santa Monica, et al., Los Angeles* County Superior Court, **1998**, Settlement

30. Consultant/Expert (P), Police Practices (Detention/Arrest/Probable Cause/Use of Force/Misconduct), *Hagood v. City of Los Altos, et al., Santa Clara* County Superior Court, **1998**, Settlement

31. Consultant/Expert (D), Security Practices, *Brigitte Brewer, et al. v. Denny's Restaurant, et al., Los Angeles* County Superior Court, **1998**, Settlement

32. Consultant/Expert (P), Police Practices (Detention/Arrest/Probable Cause/Misconduct), *Darrell Taylor v. County of Los Angeles, et al., United States District C*ourt, **1998**, Settlement

33. Consultant/Expert (P), Police Practices (Detention/Arrest/Probable Cause/Misconduct), *Damien Deshay Burris v. D. Lada #23038, et al., Los Angeles County Superior C*ourt, **1998**, Settlement

34. Consultant/Expert (P), Police Practices (Arrest/Probable Cause/Failure to Provide Medical Treatment), *Deposition Testimony, Joseph Edward Wall, et al. v. City of Fontana, et al., San Bernardino County Superior Court*, **1998**, Settlement

35. Consultant/Expert (P), Police Practices (Use of Force), *Deposition/Trial Testimony, Robert Taylor v. County of San Bernardino, et al.,* San Bernardino County Superior Court, **1998**, Defense Verdict

36. Consultant/Expert (P), Police/Security Practices (Use of Force, Unlawful Entry), *Tiseo & Halter v. City of Huntington Beach, et al.,* Orange County Superior Court, **1998**, Settlement
37. Consultant/Expert (D), Security Practices (Probable Cause/Detention/Arrest), *Villareall v. Vons, et al.,* Los Angeles County Superior Court, **1998**, Settlement

38. Consultant/Expert (P), Police Practices (Domestic Violence Procedures), *Declaration, Tristan Ellsworth, et al., v. County of Orange, et al., Orange* County Superior Court, **1998,** MSJ Granted

39. Consultant/Expert (P), Police Practices (Use of Deadly Force), *Declaration, Mattie Harrel v. City of Stockton, et al., United States District Court, Eastern District of California,* **1998**, MSJ Granted

40. Consultant/Expert (P), Police Practices (Use of Deadly Force), *Deposition Testimony, Einbeck, et al. v. Nickerson, et al., United States District Court, Southern District of California,* **1999**, MSJ Granted

41. Consultant/Expert (P), School Security Practices (Discrimination), *Denice C. Price v. Long Beach Unified School District, et al.,* Los Angeles County Superior Court, **1999**, Settlement

42. Consultant/Expert (D), Police Practices (Probable Cause/Investigation/Reporting), *Trial Testimony, People v. Walter Roy Mitchell,* Orange County Municipal Court, **1999**, Hung Jury (7-5 Acquittal)

43. Consultant/Expert (D), Security Practices (Premises/Persons), *Mal Soon Kwon v. Worldwide Security,* Los Angeles County Superior Court, **1999**, Settlement

44. Consultant/Expert (D), Security Practices (Premises/Persons), *Nathan Radi v. Ace Security,* Los Angeles County Superior Court, **1999**

45. Consultant/Expert (D), Police Practices (Probable Cause/Investigation/Use of Force/Reporting), *People v. Michael Alan Clinton,* Orange County Municipal Court, **1999**

46. Consultant/Expert (D), Security Practices (Premises Liability), *Joe Shell v. Motel 6, Worldwide Security Associates Inc.*, Los Angeles County Superior Court, **1999**, Settlement

47. Consultant/Expert (P), Police Practices (Use of Deadly Force), *Sylvia Bethea, et al. v. County of Los Angeles, et al.*, United States District Court, Central District of California, 1999, Settlement

24

48. Consultant/Expert (P), Police Practices (Use of Force), Deposition/Trial Testimony, *Alejandro Ponce v. John Byron; City of Santa Ana*, Orange County Superior Court, 1999, Defense Verdict

49. Consultant/Expert (P), Security Practices (Premises Liability, Detention, Use of Force), *Deposition/Trial Testimony*, *Oliver Olson v. Sagebrush Cantina, et al.,* Los Angeles County Superior Court, 1999, Plaintiff Verdict

50. Consultant/Expert (P), Police Practices (Investigation, Jail Procedures, Care of Prisoners), *Ruben Garcia, et al. v. County of Los Angeles, et al., Los Angeles County Superior Court*, 1999, Settlement

51. Consultant/Expert (D), Police Practices (Use of Force, Jail Procedures, Care of Prisoners), *Kenneth Neighbors v. County of Butte, et al., United States District Court, Eastern District of California*, 1999, Settlement

52. Consultant/Expert (P), Police Practices (Use of Force), Neil Hays & Bonnie Hays *v. City of Glendale, et al., United States District Court, Central District of California*, 1999, Dismissal

53. Consultant/Expert (D), Police Practices (Probable Cause/Arrest/Evidence Procedures), People *v. Ira Ethan Nesbitt, Los Angeles County Superior Court*, 1999, Plea Bargain, *Declined*

54. Consultant/Expert (P), Police Practices (Juvenile Investigations/Probable Cause/Arrest/), *Declaration*, *Bautista v. County of Kern, et al. ,United States District Court, Eastern District of California*, 1999, Dismissal

55. Consultant/Expert (D), Security Practices (Probable Cause/Investigation/Reporting), *People v. Leu & Jiau,* Orange County Municipal Court, 1999, Plea Bargain

56. Consultant/Expert (P), Police Practices (Fraudulent Entry of Warrant*), Deposition Testimony, Theresa Goldston v. City of South Pasadena, et al., Los Angeles* County Superior Court, 1999

57. Consultant/Expert (P), Police Practices (Insurance Bad Faith*), Declaration, Wendi & Gary Samaniego v. Farmers Insurance Exchange, Orange* County Superior Court, 1999, MSJ Granted

58. Consultant/Expert (P), Police Practices (Jail Procedures), *Lucy Bartlett & Larry Bartlett v. Sergeant Duran, et al.,* United States District Court, Central District of California, 1999, Settlement

59. Consultant/Expert (P), Police Practices (Detention/Arrest/Probable Cause/Person Search/Use of Force/Misconduct), *Robert Eugene Snyder v. City of Fullerton, et al.,* United States District Court, Central District of California, 1999, Settlement

60. Consultant/Expert (P), Security Practices (Failure to Provide Security), *Donna J. Banks, et al., v. Oceangate Square Homeowners' Association, Los Angeles County Superior Court,* 1999, MSJ Granted

61. Consultant (P), Police Practices (Use of Deadly Force, Criminal Investigation, Reporting Procedures, Administrative Procedures), *Michael Federici v. City of Mesa,* ▓▓▓▓▓▓, *et al.*,1999, *Declined*

25

62. Consultant (P), Police Practices (Detention/Arrest/Failure to Provide Medical Treatment/Use of Force/Misconduct), *Tremaine D. Brown v. City of Riverside, et al.*, **1999**

63. Consultant/Expert (P), Security Practices (Safety Hazards), ***Deposition/Evidence Code 402 Testimony***, *Medel v. Los Angeles Metropolitan Transit Authority, et al., Los Angeles County Superior Court,* **1999**

64. Consultant/Expert (D), Security Practices (Failure to Provide Security), *Mary Pulido v. Worldwide Security, et al., Orange County Superior Court,* **1999**, Settlement
65. Consultant/Expert (P), Police Practices (Detention, Arrest, Use of Force), ***Deposition Testimony***, *Anand-Gurdas Singh v. City of Oakland, et al.,* United States District Court, **1999**, Settlement

66. Consultant/Expert (P), Police Practices (Use of Deadly Force), ***Deposition/Trial Testimony***, *Demetrius DuBose v. City of San Diego, et al., United States District Court,* **1999**, Defense Verdict

67. Consultant/Expert (P), Security Practices (Abandonment of Post, Crime Prevention, Contract Provisions), ***Declaration, Deposition/Private Trial Testimony***, *David Wong v. Alhambra Golden Valley Shopping Center, Inc., et al., Los Angeles County Superior Court,* **1999**, Private Trial - Plaintiff Verdict

68. Consultant (P), Police Practices (Probable Cause, Search of Vehicle, Misconduct), *Simpson v. City of San Jose, et al., Santa Clara County Superior Court,* **1999**

69. Consultant/Expert (P), School Security Practices (School Violence Procedures), *Tyars & Raby v. County of Los Angeles, et al.,* Los Angeles County Superior Court, **1999**, Settlement

70. Consultant (P), Police Practices (Investigation Procedures, Probable Cause, Arrest, Misconduct), *Shamshoum v. City of Escondido, et al.,* **1999**

71. Consultant/Expert (D), Police Practices (Probable Cause, Arrest, Booking Procedures, Use of Force*), Lewis v. City of Colton, et al.,* United States District Court, Central District of California, **2000**, Experts Excluded.

**72.** Consultant/Expert (P), Police Practices (Probable Cause, Use of Force, Arrest*), Edwin Raymone Morgan v. City of Oakland, et al.,* United States District Court, Eastern District of California, **2000**, Settlement

*73.* Consultant/Expert (P), Security Practices (Need Assessment), *Declaration, Theresa Langell v. Looff's Amusements, et al.*, Los Angeles County Superior Court, 2000, Settlement

74. Consultant/Expert (P), Police Practices (Child Abuse/Homicide Investigation, Misconduct*), Renee Neaves, et al. v. City of San Diego, et al., United States District Court, 2000, MSJG, On Appeal*

75. Consultant/Expert (P), Police Practices (Probable Cause, Use of Force, Arrest), *Bryan Scott v. City of Oakland, et al.* United States District Court, Eastern District of California, **2000**, Settlement

76. Consultant/Expert (P), Police Practices (Probable Cause, Use of Force, Arrest), *Olivia Alejandre v. City of Keizer, Oregon, et al., United States District Court, District of* ████████, **2000**, Settlement

77. Consultant (P), Police Practices (9-1-1 Procedures, Emergency Response), *Murrell Porche v. City of Chicago, Illinois, et al., Circuit Court of Cook County,* ████████, **2000**

78. Consultant (P), Police Practices (Alcoholic Beverage Control), Security Practices (Safety), *Ramos v. Mindas Restaurant, et al.,* **2000**
79. Consultant/Expert (P), Police Practices (Booking/Identification Procedures), *Pham v. Michael Capizzi, et al.*, United States District Court, Central District of California, **2000**

80. Consultant/Expert (P), Police Practices (Probable Cause, Vehicle/Person Search, Misconduct), *Declaration*, *LaBomme/Scrivens v. City of Barstow, et al., San Bernardino County Superior Court,* **2000**

81. Consultant/Expert (P), Security Practices (Hiring, Training, Supervision, Use of Force), *Deposition/Trial Testimony*, *Milin v. Cohiba Cigars, et al., Los Angeles County Superior Court,* **2000**, Defense Verdict

82. Consultant/Expert (P), Security Practices (Hiring, Training, Supervision, Use of Force), *Anthony Rain v. Cowboy Boogie, et al., Orange County Superior Court,* **2000**, Settlement

83. Consultant/Expert (P), Police Practices (Arrest Tactics), *Declaration, Frost v. County of Sonoma, et al., Sonoma County Superior Court, ,* **2000**, *MSJ Granted, L Decline*

84. Consultant/Expert (P), Police Practices (Administration, Fitness for Duty), *Deposition Testimony*, *Gonzales/Johnson v. Kazaryan*, Los Angeles County Superior Court, **2000**

85. Consultant/Expert (P), Police/Security Practices (Homicide Investigation, Physical Security, Foreseeability), *Deposition Testimony*, *Elizondo v. Brightonwood Townhomes, et al.,* Los Angeles County Superior Court, **2000**, Settlement, $2,300,000.

86. Consultant/Expert (P), Security Practices (Physical Security, Foreseeability), *Declaration*, *Bonilla, et al. v. Purayidom, et al.*, Los Angeles County Superior Court, **2000**, Settlement

87. Consultant (D), Police Practices (Barricaded Subject, Use of Force) *People v. So*, Los Angeles County Superior Court, **2000**, *Declined*

88. Consultant (D), Police Practices (Homicide Investigation, Interview of Witness), Los Angeles County Superior Court, **2000**, *Declined*

89. Consultant (P), Security Practices (Contract Security Services, Foreseeability), *Trial Testimony*, *Stuto v. McDonalds's Restaurants, et al.*, Supreme Court of the State of ▓▓▓▓ ▓▓▓▓, County of Suffolk, **2000**, Defense Verdict

90. Consultant/Expert (D), Police Practices (Probable Cause, Arrest, Use of Force), *Donald Vieth v. P. Crowe, et al.,* United States District Court, Central District of California, **2000**, Settlement

91. Consultant/Expert (P), Security Practices (Private Parking Enforcement, Use of Force, Hiring Standards, Training, Supervision), *Deposition Testimony, Amy Nielsen v. Motel 6, et al.,* Orange County Superior Court, **2000**, Plaintiff Verdict

92. Consultant/Expert (P), Police Practices (Vehicle Operations), *Deposition Testimony, Kent Cesler v. City of Davenport, Iowa, et al.,* ▓▓▓▓ District Court in and for Scott County, **2000**, Plaintiff Verdict, $1,000,000

93. Consultant/Expert (P), Police Practices (Jail Procedures), *Chheang v. City of Long Beach, et al.,* Los Angeles County Superior Court, **2000**, Settlement

94. Consultant/Expert (P), Security Practices (Arrest, Use of Force, Hiring Standards, Training, Supervision), *Travis Gillette v. Borderline Bar & Grill,* Ventura County Superior Court, **2000**, Settlement

95. Consultant/Expert (P), Security Practices (Arrest, Use of Force, Hiring Standards, Training, Supervision), *Deposition Testimony, Confidential,* El Dorado County Superior Court, **2000**, *Settlement (Confidential)*

96. Consultant/Expert (P), Police Practices (Probable Cause, Arrest, Use of Force), *Chris White v. County of Riverside, et al.,* United States District Court, Central District of California, **2000**

97. Consultant/Expert (P), Security Practices (Foreseeability, Failure to Provide Adequate Security), *Lindo & Smith v. Orsini, et al.,* Los Angeles County Superior Court, **2000**, Settlement

98. Consultant/Expert (D), Security Practices (Arrest, "Probable Cause"), *Rojas v. La Curacao, et al.,* Los Angeles County Superior Court, 2000, Settlement

99. Consultant/Expert (P), Police Practices (Probable Cause, Arrest, Use of Force), *Deposition Testimony, Thomas Drummond v. City of Anaheim, et al.*, United States District Court, Central District of California, 2000, *MSJ Granted, On Appeal, Reversed*

100. Consultant/Expert (D), Security Practices (Security Procedures, Access Control), *Rapid Freightways v. Universal Protection Service, Binding Arbitration*, 2001, Settlement

101. Consultant (P), Police Practices (Probable Cause, Arrest, Persons with Disabilities, Dependent Children, Immigration Law), *Maximiliano Mateo Morales v. City of Tustin, et al.*, Orange County Superior Court, California, 2001

28

102. Consultant/Expert (P), Security Practices (Arrest, Use of Force, Hiring Standards, Training, Supervision), *Declaration, Deposition Testimony*, *Sabow, Durante, & Meir v. Buzz Funbar, et al.*, Maricopa County Superior Court, ████████, **2001**, Settlement

103. Consultant/Expert (P), School Security Practices (Supervision of Students), Declaration, *Deposition Testimony*, *Durant v. Los Angeles Unified School District*, et al., Los Angeles County Superior Court, **2001**, Non-Suit, Reversed on Appeal

104. Consultant/Expert (D), Security Practices (Foreseeability, Security Measures), *Declarations (2)*, *Gomez v. Jimmy Ly, et al., Sacramento County Superior Court*, **2001**, MSJ Granted

105. Consultant/Expert (P), Police Practices (Probable Cause, Arrest, Investigative Procedures), *A.B. Butler v. City of Tyler*, ██████, et al., **2001**

106. Consultant (P), Police Practices (Probable Cause, Arrest, Search & Seizure), *Robert Kayvon v. City of Gardena, et al.*, Los Angeles County Superior Court, California, **2001**, *Declined*
107. Consultant/Expert (P), Security Practices (Probable Cause, Arrest, Hiring Standards, Training, Supervision), *Rita Ferrer v. K-Mart Corporation, et al.*, Los Angeles County Superior Court, **2001**, Settlement

108. Consultant/Expert (P), Police Practices (Probable Cause, Arrest, Investigative Procedures), *Phillips v. Beverly Hills Unified School District, et al. Los Angeles County Superior Court*, **2001**

109. Consultant/Expert (P), Police Practices (Probable Cause, Arrest, Investigative Procedures, Search & Seizure, Reporting), *Lutge v. City of San Rafael, et al. Marin County Superior Court*, **2001**

110. Consultant/Expert (P), Police Practices (Probable Cause, Arrest, Use of Force, Reporting), *Wallace v. City of Los Angeles, et al. Los Angeles County Superior Court*, **2001**

111. Consultant/Expert (D), Police/Security/Private Persons Practices (Probable Cause, Crime Prevention, Reasonable Force), *Carlton Robinson v. Countryside Liquors, et al.*, Santa Clara County Superior Court, **2001**, Settlement

112. Consultant/Expert (P), Police Practices (Traffic Citation Arrests, Search & Seizure, Jail Procedures), *Arrow Worrall v. Officer Martinez, et al.,* United States District Court, Central District of California, **2001**, Settlement

113. Consultant/Expert (P), Police Practices (Vehicle Pursuit), *Deposition/Trial Testimony*, *Declaration, Sweezey v. Hawaii County Police Department, et al.*, the Circuit Court of the Third District, State of ████████, **2001**, Plaintiffs' Verdict, $5,600,000 Gross, 34% Liability.

114. Consultant/Expert (P), Police Practices (Police Vehicle Operations, Police Emergency Response), *Deposition/Trial Testimony*, *Tu Than Nguyen v. City of Westminster, et al.*, Orange County Superior Court, **2001**, Plaintiff Verdict (20% Liability)

29

115. Consultant/Expert (P), Police Practices (Probable Cause, Seizure, Use of Deadly Force), *Gonzalez v. Cortez, et al., United States District Court, Central District of California,* **2001**, *Substitution of Attorneys*

116. Consultant/Expert (P), Police Practices (Murder for Hire Investigation, Entrapment), **Declaration**, *Stalberg v. City of Montebello, et al.*, United States District Court, Central District of California, **2001**

117. Consultant/Expert (P), Police Practices (Use of Force, False Imprisonment, Release on Citation), *Deposition/Trial Testimony, Sanders v. City of Long Beach, et al., Los Angeles County Superior Court,* **2001**, Plaintiff Verdict

118. Consultant/Expert (P), Police Practices (Probable Cause, Arrest, Use of Force, False Imprisonment, Search/Inventory of Vehicle), *Schneider v. County of Santa Barbara, et al., Santa Barbara County Superior Court,* **2001**, Settlement

119. Consultant/Expert (P), Security Practices (Screening/Hiring, Training, Supervision, Use of Force), *Deposition Testimony, Wakeling v. Morrissey, et al., Los Angeles County Superior Court,* **2001**, Settlement

120. Consultant/Expert (P), Police Practices (Traffic Collision Investigation and Investigation Policy, Police Ethics), *Declaration, Agasang v. Bolander, et al.*, United States District Court, Central District of California, **2002**

121. Consultant/Expert (P), Security Practices (Event Security, Eviction Procedures, Use of Force), *Deposition/Trial Testimony, Trujillo, et al. v. Arrowhead Pond, et al.*, Orange County Superior Court, **2002**, Defense Verdict

122. Consultant/Expert (P), Police Practices (Probable Cause, Search Warrants, Seizure, Use of Deadly Force), *Deposition Testimony, Figueroa, et al. v. City of Santa Maria, et al., United States District Court, Central District of California,* **2002**, *MSJ Granted.*

123. Consultant/Expert (D), Police Practices (Probable Cause, Use of Force), *In Re Aviles, San Mateo County Juvenile Court,* **2002**, *Petition Not Sustained*

124. Consultant/Expert (P), Police Practices (Firearms Safety Procedures, Killing of Animal), *Declaration, Desiree & Bradley Zinich v. Officer Ronald DeChamplain, CHP, et al., Madera County Superior Court,* **2002**, *Settlement*

125. Consultant/Expert (D), Police Practices (Probable Cause, Vehicle Code Enforcement), *People v. Alano Zareh Kokozian, Los Angeles County Municipal Court,* **2002**, *L Decline*

126. Consultant/Expert (P), Police Practices (Use of Force, Assault Under the Color of Authority, Inhumane Treatment of Prisoner, Failure to Provide Medical Treatment), *Ismael Velasco Hernandez v. County of Kern, et al., Kern County Superior Court,* **2002**, *Settlement*

30

127. Consultant (P), Police Practices (Use of Deadly Force, Handling Mentally Ill Persons), *Brown v. Amtrak, et al., Philadelphia,* ▓▓▓▓▓▓▓▓, 2002, *Settlement*

128. Consultant/Expert (P), Police Practices (Use of Deadly Force, Use of Canine, Handling Mentally Ill Persons), *Deposition/Trial Testimony, Flores v. City of San Diego, et al., United States District Court, Southern District of California,* **2002,** Defense Verdict, On Appeal

129. Consultant/Expert (P), Police Practices (Use of Force, Medical Emergency Procedures), *Deposition/Trial Testimony, Poe v. City of San Diego, et al., United States District Court, Southern District of California,* **2002**, *Defense Verdict*

130. Consultant/Expert (P), Police Practices (Use of Force), *Deposition Testimony, Yan v. City of San Diego, et al., San Diego County Superior Court,* **2002**, *Settlement*

131. Consultant/Expert (P), Security Practices (Foreseeability, Security Measures), *Bernadette R. v. Rob D. Walker, et al., Riverside County Superior Court,* **2002**

132. Consultant (P), Police Practices (Detention, Probable Cause, Arrest/Booking Procedures, False Imprisonment, Citizen Complaint Procedures, Hiring, Retention, Supervision), *Declaration, Deposition Testimony, Martin Lopez v. Fontana Unified School District, et al., San Bernardino County Superior Court,* **2002,** Settlement

133. Consultant/Expert (P), Police Practices (Detention, Probable Cause, Search of Person, Citizen Complaint Procedures, Supervision), *Deposition/Trial Testimony, Donald Rochon v. City of Carlsbad, et al., United States District Court, Southern District of California,* **2002**, *Defense Verdict*

134. Consultant/Expert (D), Police Practices (Homicide/Suicide Investigation, Consent Search, Exigent Circumstance Search), *Andaluz v. City of Brea, et al., Orange County Superior Court,* **2002**, *Settlement*

135. Consultant/Expert (P), Security Practices (Foreseeability, Security Measures), *Deposition Testimony, Childers & Zabaneh v. Wild Woolly's Saloon, et al., San Diego County Superior Court,* **2002**, *Settlement*

136. Consultant/Expert (D), Security Practices (Foreseeability, Security Measures), *Court, et al. v. Atwater Elementary School District, et al., Merced County Superior Court,* **2002**

137. Consultant (P), Police Practices (Probable Cause, Arrest, Alcoholic Beverage Control Premises Enforcement), *Avalos v. City of El Cajon, et al., United States District Court, Southern District of California,* **2002**

138. Consultant/Expert (D), Police Practices (Police Vehicle Operations, Police Emergency Response), *Deposition/Trial Testimony, City of Hawthorne, et al. v. Sharma Lee Gnanakone,* Los Angeles County Superior Court, **2002**, Split Verdict

31

**139.** Consultant/Expert (P), Police Practices (Probable Cause, Seizure, Use of Deadly Force), *Gonzalez v. Cortez, et al., United States District Court, Central District of California,* **2002,** *Settlement*

**140.** Consultant/Expert (A), Police Administrative Practices, Police Practices (Police Pursuit Intervention, Police Vehicle Operations, Felony Stops, Arrest Procedures), *Delander v.* ▮▮▮▮ *Department of Public Safety,* **2002,** *Settlement*

**141.** Consultant/Expert (P), Police Practices (Probable Cause, Seizure, Use of Deadly Force), *Deposition/Trial Testimony, Huertero v. Huntington Beach Police Department, et al.,* United States District Court, Central District of California, **2002,** Plaintiff Verdict, $2,100,000

**142.** Consultant/Expert (P), Police Practices (Use of Deadly Force), *Deposition/Trial Testimony, Ruiz v. County of Los Angeles, et al.,* Los Angeles County Superior Court, **2002,** Defense Verdict

**143.** *Consultant/Expert (D), Police Practices (Trespassing, Self Defense, Police Administrative* Procedures), *Evidence Code 402 Hearing/Trial Testimony, People v. Brindle, Orange County Superior Court,* **2002,** *Jury Verdict – Not Guilty, Guilty*

**144.** Consultant/Expert (P), Police Practices (Probable Cause, Arrest, Use of Deadly Force), *Trial Testimony, Johnson* v. *Gary Keeler, et al.,* United States District Court, Eastern District of California, **2002,** Defense Verdict

**145.** Consultant/Expert (D), Security Practices (Foreseeability, Security Measures), *Diego v. MBK Real Estate, et al., Seattle,* ▮▮▮▮▮▮▮▮, **2002**

**146.** *Consultant/Expert (P), Police Practices (Trespassing, Police Response to Calls For Service, Civil Disputes), City of Lake Oswego v. Jerry D. Stubblefield, et al., Clackamas County Circuit Court, Oregon City,* ▮▮▮▮▮▮, **2003,** *Settlement*

**147.** *Consultant/Expert (P), Police Practices (Fraud Investigation, Probable Cause, Arrest Warrant Affidavits), Mendoza & Mendoza v. Michael S. Carona, Sheriff, et al., United States District Court, Central District of California, Santa Ana Division,* **2003,** *Settlement*

**148.** *Consultant/Expert (D), Police Practices (Reasonable Suspicion, Involuntary Detention, Felony Evading, Use of Deadly Force), People v. Kevin Smith, San Bernardino County Superior Court,* **2003,** *Declined*

**149.** *Consultant/Expert (P), Police Practices (Investigation, Identification of Suspect, Probable Cause, Arrest, Warrant Service), Mead v. U.S. Department of Justice, et al., United States District Court, Central District of California, Santa Ana Division,* **2003,** *Settlement*

**150.** Consultant/Expert (P), Security Practices (Foreseeability, Security Measures, Intervention), *Salgado v. Notarianni, et al., Riverside County Superior Court,* **2003,** *Settlement*

151. Consultant/Expert (P), Police Practices (Use of Deadly Force), *Carter v. County of San Bernardino, et al.*, United States District Court, Central District of California, **2003**, Settlement

152. Consultant/Expert (D), Police Practices (Probable Cause, Persons with Disabilities (5150 Health & Safety Code), Use of Force), *Deposition/Trial Testimony*, *Marlon Bishop v. City of Inglewood, et al.*, Los Angeles County Superior Court, **2003**, Split Verdict.

153. Consultant/Expert (P), Security Practices (Premises Liability, Foreseeability, Security Measures, Intervention), *Wells, et al. v. Estate of Vicki L. Wright, et al., San Diego County Superior Court,* **2003***, Settlement*

154. Consultant (P), Police Practices (Juvenile Procedures, Use of Force), *Deposition Testimony*, *Gibbons v. City of Lompoc, et al.*, Santa Barbara Superior Court, **2003**, Settlement

155. Consultant/Expert (P), Police Practices (Probable Cause, Arrest, Citizen Complaint Procedures), *Michael Dell'Orto v. Greg Stark, et al.*, United States District Court, Eastern District of California, **2003**

156. Consultant/Expert (D), Police Practices (Pursuit Procedures, Arrest Procedures, Use of Force), *People v. Rudolph Garcia*, San Mateo County Superior Court, **2003**

157. Consultant/Expert (D), Police Practices (Probable Cause, Arrest, Use of Force, Medical Assistance Procedures), *Octavio Benavidez v. City of Ontario, et al.*, United States District Court, Central District of California, **2003**

158. Consultant/Expert (P), Police Practices (Pursuit Procedures, Use of Deadly Force*), Deposition Testimony, Adams v. Speers, et al.*, United States District Court, Eastern District of California, **2003**

159. Consultant/Expert (P), Police Practices (Arrest Procedures, Use of Deadly Force), *Kazerski v. County of San Diego, et al.*, San Diego County Superior Court, **2003**

160. Consultant (P), Police Practices (Probable Cause, Search Warrant Affidavit, Arrest Procedures, Provision of Medical Care), *Maggie Cook v. State of California, et al.,* Contra Costa County, **2003**

161. Consultant (D), Police Practices (Citizen Complaint Procedures, Administrative Procedures, Administrative Investigations, Criminal Investigations), *Estate of Chrystal Brame, et al. v. City of Tacoma*, Washington, et al., Pierce County, ▓▓▓▓▓▓▓ **2003**

162. Consultant/Expert (P), Police Practices (Police Authority/Military Installation, Consensual Searches, Probable Cause, Arrest), *Greg Alan Morgan v. United States of America*, United States District Court, Central District of California, **2003**

163. Consultant (P), Security Practices (Probable Cause, Involuntary Detention, Search), *Dannie & Stephanie Howard v. Burlington Coat Factory Warehouse, et al., District Court of Oklahoma County, State of* ▓▓▓▓▓▓▓, **2003**

33

164. Consultant/Expert (P), Security Practices (Foreseeability), *Torsten G. Kunert v. McDonald's, et al.*, Los Angeles County Superior Court, **2003**, Settlement

165. Consultant/Expert (P), Police Practices (Police Procedures, Use of Deadly Force), *Trial Testimony*, *Mendoza v. City of Long Beach, et al.*, United States District Court, Central District of California, **2003**, Defense Verdict

166. Consultant/Expert (P), Security Practices (Foreseeability, Selection, Hiring, Training), *Duane Herbert Baudy v. Death Row Records, et al.*, Los Angeles County Superior Court, **2003**, Settlement

**167.** Consultant/Expert (P), Police Practices (Police Procedures, Use of Force), *Deposition Testimony*, *Jimenez/Maae v. City of Costa Mesa*, United States District Court, Central District of California, **2003**

168. Consultant (P), Police Practices (Police Procedures, Use of Deadly Force), *Flores-Valdivia v. United States of America*, United States District Court, Southern District of California, **2003**, *Declined*

169. Consultant/Expert (P), Police Practices (Drug Investigation, Probable Cause, Search Warrant Affidavit), *Deposition Testimony*, *Importante v. County of Los Angeles, et al.*, United States District Court, Central District of California, **2003**, MSJ Granted

170. Consultant/Expert (P), Police Practices (Police Procedures, Use of Deadly Force), *Nolte v. City of San Diego*, United States District Court, Southern District of California, **2003**, Dismissal

171. Consultant/Expert (P), Police Practices (Training, Discipline, Supervision, Retention), *Deposition Testimony*, *Tanguay v. Lerman, et al.*, Kern County Superior Court, **2003**, Plaintiff Verdict, $4,200,000

172. Consultant/Expert (P), Police Practices (Search & Seizure, Use of Force), *Declaration*, *Rezes v. City of Fontana, et al.*, San Bernardino County Superior Court, **2003**

173. Consultant/Expert (P), Police Practices (Persons with Disabilities, Probable Cause, Arrest, Use of Force), *Deposition Testimony*, *Jeffrey Best v. County of Calaveras, et al.*, Calaveras County Superior Court, **2003**

174. Consultant/Expert (P), Police Practices (Affidavit, Search Warrant, Collection & Preservation of Evidence), *Declaration*, *Levine, et al. v. City of Huntington Beach, et al.*, Orange County Superior Court, **2003**

175. Consultant/Expert (P), Police Practices (Use of Force, Restraint Procedures, Use of Authorized/Unauthorized Equipment), *Garcia, et al. v. City of Fullerton, et al.*, Orange County Superior Court, **2003**, Settlement

34

**176.** Consultant/Expert (A), Police Practices (Vice Investigations, Lewd Conduct Enforcement), *Administrative Hearing Testimony*, *State of California v. Beljan*, State of California Administrative Hearing, **2003**

**177.** Consultant/Expert (P), Police Practices (Probable Cause, Premises Search, Animal Control Procedures), *Huerta, et al. v. County of San Bernardino, et al.,* San Bernardino County Superior Court, **2003**, Settlement

**178.** Consultant/Expert (D), Police Practices (Field Tactics, Arrest, Evidence Procedures), *United States v. Jones,* United States District Court, Southern District of California, **2003**, Dismissal

**179.** Consultant (P), Police Practices (Field Tactics, Crimes In Progress), Confidential, **2003**

**180.** Consultant/Expert (P), Police Practices (Probable Cause, Search & Seizure, Arrest, Use of Force), *Lowe v. County of Los Angeles, et al.,* Los Angeles County Superior Court, **2003**, Settlement

**181.** Consultant/Expert (P), Police Practices (Probable Cause, Arrest, Report Writing, Court Testimony, Ethics, Misconduct), *Sanchez v. City of Costa Mesa, et al.,* Orange County Superior Court, **2003**, Settlement

**182.** Consultant/Expert (P), Police Practices (Assault, Battery, Teaching Standards), *Deposition/Trial Testimony*, *Servillo v. County of Los Angeles, et al.,* Los Angeles County Superior Court, **2004**, Defense Verdict

**183.** Consultant/Expert (D), Security Practices (Adequacy, Policies, and Procedures), *Maurizio v. Circus Disco & Arena, et al.*, Los Angeles County Superior Court, **2004**, MSJ Granted

**184.** Consultant/Expert (P), Security Practices (Selection, Training, Supervision, Policies, and Procedures, Use of Force, False Imprisonment), *Deposition/Trial Testimony*, *Michael A. Barker v. Gilliam & Wales of Dublin, Inc., et al.,* Los Angeles County Superior Court, **2004**, Defense Verdict

**185.** Consultant/Expert (P), Police Practices (Probable Cause to Arrest, False Imprisonment, Battery), *Deposition Testimony*, *Cruz v. City of Huntington Beach, et al.,* United States District Court, Southern District of California, **2004,** Settlement

**186.** Consultant/Expert (P), Police Practices (Civil Disputes, Use of Force), *Trial Testimony*, *Patel v. City of El Centro, et al.,* Imperial County Superior Court, **2004**, Non-Suit

**187.** Consultant/Expert (D), Police Practices (Probable Cause to Arrest, Resist, Delay, Obstruct Officer), *Evidence Code 402 Hearing/Trial Testimony, People* v. *James Kinder,* San Diego County Superior Court, **2004**, Guilty

**188.** Consultant/Expert (P), Security Practices (Adequacy, Forseeability), *Declaration*, *Flores v. Los Angeles Unified School District,* Los Angeles County Superior Court, **2004**

35

189. Consultant/Expert (A), Police Practices (Administrative Practices, Internal Affairs Investigations, Discipline), *City of Signal Hill v. Janet Seery,* Administrative Hearing, **2004**

190. Consultant/Expert (P), Security Practices (Detention, Arrest Procedures), *Owen, et al. v. Farnham Security, et al.,* Los Angeles County Superior Court, **2004,** Settlement

191. Consultant/Expert (P), Police Practices (Probable Cause, Arrest, Search & Seizure, Use of Force), *Deposition/Trial Testimony, Jorge Alfaro, et al. v. County of Orange, et al.,* Orange County Superior Court, **2004,** Defense Verdict

192. Consultant/Expert (P), Police Practices (Use of Deadly Force), *Deposition Testimony, Castillo v. United States,* United States District Court, Southern District of California, **2004**

193. Consultant/Expert (P), Police Practices (Investigation, Detention, Probable Cause, Arrest), *Graham, et al. v. Matthews, et al.,* United States District Court, Western District of ▒▒▒▒▒▒, **2004**

194. Consultant/Expert (D), Police Practices (Arrest Procedures, Use of Force), *Evidence Code 402 Hearing/Trial Testimony, People v. Ray Cruz,* Orange County Superior Court, **2004,** Guilty

195. Consultant/Expert (P), Security Practices (Foreseeability, Security Measures), *Christopher Cochrane v. Mark Leo Ramos, 5th Quarter Bar, et al.,* Santa Clara County Superior Court, **2004,** Settlement

196. Consultant/Expert (D), Police Practices (Police Vehicle Operations, Police Emergency Response), *Deposition Testimony, Evidence Code 402 Hearing, Salcedo v. Pharmaceutical Research, et al.,* Los Angeles County Superior Court, **2004,** Defense Verdict

197. Consultant/Expert (P), Police Practices (Use of Force, Emergency Police Medical Procedures), *Deposition Testimony, Turner v. City of Long Beach, et al., Los Angeles County Superior Court,* **2004,** Settlement

198. Consultant/Expert (D), Security Practices (Probable Cause to Detain/Arrest), *Sara Lopez v. Muir Terrace Homeowners' Association, et al., Los Angeles County Superior Court,* **2004,** Settlement

199. Consultant (P), Police Practices (Police Vehicle Operations, Police Vehicle Pursuit Policies/Procedures), *Edwards, et al. v. City of Killeen,* ▒▒▒▒▒, *et al.,* District Court of Bell County, TEXAS, **2004**

200. Consultant (P), Police Practices (Jail Procedures, Use of Force), *Estate of Cotton, et al. v. County of Santa Barbara, et al.,* Santa Barbara County Superior Court, 2004

201. Consultant/Expert (P), Police Practices (Investigative Procedures), *Zepeda v. County of Orange, et al.,* United States District Court, Southern District of California, 2004, Settlement

36

**202.** Consultant (D), Security Practices (Probable Cause to Detain/Arrest, Use of Force), *Guerra v. Taylor, Los Angeles County Superior Court,* **2004,** Settlement

**203.** Consultant (P), Police Practices (Investigative Procedures), *Wyniemko v. Clinton Township, ████████, et al., United States District Court, Eastern District of Michigan, 2004*

**204.** Consultant (P), Police Practices (Offender Identification Procedures), *Greenwood v. State of ████████, et al., Superior Court of Arizona, County of Maricopa, 2004*

**205.** Consultant/Expert (P), Police Practices (Use of Force), *Deposition Testimony*, *Emerson v. Amador County, et al.,* United District Court, Eastern District of California, 2004

**206.** Consultant (P), Police Practices (Probable Cause, Search & Seizure, Exigent Circumstances), *Deposition Testimony*, *Jacobo, et al. v. City of Escondido, et al.,* San Diego County Superior Court, 2004

**207.** Consultant (P), Police Practices (Probable Cause, Search Warrant Affidavits, Use of Force), *Declaration*, *Dela Torre, et al. v. Fresno County, et al.,* United District Court, Eastern District of California, 2004

**208.** Consultant (P), Police Practices (Vice Enforcement, Alcoholic Beverage Control, Entertainment Permits), *Café Moulin Rouge v. City of Huntington Beach, et al.,* United District Court, Central District of California, 2004

**209.** Consultant/Expert (P), Security Practices (Foreseeability / Adequacy of Security), *Higgins v. Charlie's Live Entertainment,* Los Angeles County Superior Court, **2004**

**210.** Consultant/Expert (P), Police Practices (Use of Force), *John Doe v. City of Hermosa Beach, et al.,* Superior Court of California, Los Angeles County, 2005, Settlement

**211.** Consultant (P), Security Practices (Use of Deadly Force, Wrongful Death), *Hasty v. Alamo, San Joaquin County Superior Court,* **2005**

**212.** Consultant/Expert (P), Police Practices (Assault/Battery, Use of Force, Reporting and Investigation of Use of Force), *Dexter Scott v. Las Vegas Metropolitan Police Department, et al.,* Clark County, ████████, 2005

**213.** Consultant (D), Police Practices (Traffic Collision Investigation, Probable Cause, Detention, Arrest, Resisting Arrest), *People v. Roddenberry*, San Mateo County Superior Court, 2005

**214.** Consultant/Expert (P), Police/Security Practices (Selection, Screening, Background Investigations, Supervision), *John RSL Doe v. Harbor Day School, et al.,* Superior Court of California, Orange County, 2005

37

**215.** Consultant/Expert (D), Police/Security Practices (Foreseeability, Emergency Response, Reporting), *Carmen Vigil v. American Commercial Security Services, et al.,* Superior Court of California, Los Angeles County, 2005, MSJ

**216.** Consultant/Expert (P), Police Practices (Traffic Enforcement Procedures, Radio Communications, Arrest, Search & Seizure, Use of **Deadly Force**), *Deposition Testimony, Lee Zigan, et al. v. State of California (CHP), et al.*, United States District Court, Central District of California, 2005, Defense MSJ Granted

**217.** Consultant/Expert (P), Police Practices (Drug Transactions, Identification Procedures, Arrest Warrants), *Zepeda v. United States, Drug Enforcement Administration, et al.*, United States District Court, Central District of California, 2005

**218.** Consultant/Expert (P), Police Practices (**Use of Force**), *Yacobucci v. County of San Bernardino, et al.*, San Bernardino County Superior Court, 2005

**219.** Consultant/Expert (P), Police Practices (Patrol Procedures, **Use of Force**), *Williams v. City of Oakland, et al.,* Alameda County Superior Court, 2005

**220.** Consultant (P), Police Practices (Probable Cause, Warrant Arrest), Gonzalez *v. California Highway Patrol, et al.,* Orange County Superior Court, 2005

**221.** Consultant/Expert (D), Police Practices (**Use of Force**, Arrest Procedures), People v. Jerrad Harrison, San Diego County Superior Court, 2005

**222.** Consultant/Expert (P), Police/Security Practices (Security Officer Procedures, False Imprisonment, Reporting), *Dawes, et al. v. Motel 6, et al.*, United States District Court, Eastern District of ▓▓▓▓▓▓▓▓▓, 2005

**223.** Consultant/Expert (D), Police/Security Practices (Police Response, Investigation, Security Adequacy/Reporting), *Macias v. Newmark Merrill & Company, et al.*, San Diego County Superior Court, 2005

**224.** Consultant (P), Police Practices (Arrest, Booking, Jail Procedures, Use of Force), *Deposition Testimony, David Palmer v. Kern County Sheriff's Department, et al.*, Kern County Superior Court, 2005, Settlement

**225.** Consultant/Expert (D), Police Practices (Use of Force), *Lonnie Young v. City of Los Angeles, et al.*, United States District Court, Central District of California, 2005, Settlement

**226.** Consultant (P), Security Practices (Self-Defense, Warning Shots, Use of Force), *Martinez v. El Magnate, et al.*, Los Angeles County Superior Court, 2005

**227.** Consultant (P), Police Practices (Police Vehicles Operations, Traffic Collision Investigation, Reporting), *Gregory C. Pluta, Sr. v. County of Hawaii, et al.*, Circuit Court of the Third Circuit, State of ▓▓▓▓▓▓, 2005

38

228. Consultant/Expert, Police Practices (Police Vehicle Pursuit Operations), *Declaration, People v. Michelle Arlene White (Appeal)*, Orange County Superior Court, 2005

229. Consultant/Expert, Police Practices (Probable Cause, Arrest, Use of Force, *Dunne v. City of Costa Mesa*, Orange County Superior Court, 2005, Settlement

230. Consultant/Expert (P), Police Practices (Police Vehicles Operations, Police Vehicular Pursuits, Reporting), *Alcala, et al. v. City of Corcoran, et al.*, Kings County Superior Court, 2005

231. Consultant (P), Police Practices (Probable Cause, Arrest, Strip Search), *Negrete, et al. v. County of Riverside, et al.*, Riverside County Superior Court, 2005, Settlement

232. Consultant (D), Police Practices (Traffic Collision Investigation), *Foust, et al. v. B & D Construction Co., Inc., et al.*, San Bernardino County Superior Court, 2005, Settlement

233. Consultant/Expert (P), Police Practices (Search Procedures, Use of Force, Reporting), *Deposition Testimony, Leal v. San Jose Police Department, et al.*, United States District Court, Northern District of California, 2005

234. Consultant/Expert (D), Police Practices (Use of Deadly Force), *Vasquez v. Ontario Police Department, et al.*, United States District Court, Central District of California, 2005, Defense Verdict

235. Consultant/Expert (P), Police Practices (Probable Cause, Arrest, Use of Force), *Arthur Pawloski v. City of Huntington Beach, et al.*, Orange County Superior Court, 2005, Settlement
236. Consultant/Expert (P), Police Practices (Probable Cause, Arrest, Use of Force), *Coover v. County of San Diego, et al.*, San Diego County Superior Court, 2005

237. Consultant/Expert (D), Police Practices (Patrol Procedures, Tactics, Use of Deadly Force), *People v. Confidential*, Los Angeles County Superior Court, 2005

238. Consultant (D), Police Practices (Patrol Procedures, Tactics, Use of Force), *Sean Hansen, et al. v. Stephen Lillis, et al.*, Los Angeles County Superior Court, 2006

239. Consultant (P), Security Practices (Gang Identification / Association / Behavior / Investigation), Detention, Arrest), *Nettie Johnson, et al. v. Six Flags Theme Parks, et al.*, Los Angeles County Superior Court, 2006, Settlement

240. Consultant/Expert (P), Police Practices (Handling Mentally Ill Persons, Tactics, Use of Deadly Force), *Robbins v. City of Hanford,* Kings County Superior Court, 2006

241. Consultant (D), Police Practices (Probable Cause, Arrest, Tactics Use of Force), *Confidential,* Sonoma County Superior Court, 2006

39

**242.** Consultant/Expert (P), Police Practices (Handling Suspected Mentally Ill Persons, Tactics, Use of Deadly Force), *Donovan v. County of Riverside,* Riverside County Superior Court, 2006, Settlement

**243.** Consultant/Expert (P), Police Practices (Tactics, Use of Force), *Tena v. County of Los Angeles,* Los Angeles County Superior Court, 2006

**244.** Consultant/Expert (P), Police Practices (Tactics, Use of Force, Reporting), *People v. Ernesto Galvan & Fermin Galvan-Magana,* Yolo Los Angeles County Superior Court, 2006

**245.** Consultant/Expert (P), Police Practices (Tactics, Pat-Down, Probable Cause, Use of Force), *Deposition Testimony, Alicea, et al. v. California Highway Patrol, et al.,* Los Angeles County Superior Court, 2006

**246.** Consultant (D), Police Practices (Use of Force), *People v. Ricky Johnson*, Sonoma County Superior Court, 2006

**247.** Consultant (D), Police Practices (Use of Force), *People v. Arthur Brown*, Los Angeles County Superior Court, 2006, Dismissal

**248.** Consultant (D), Police Practices (Domestic Violence, Seizure of Weapons), *People v. Juanita Garcia*, Los Angeles County Superior Court, 2006

**249.** Consultant (P), Police Practices (DUI Enforcement), *Efrain Ojeda Sanchez, et al. v. Michael Zamora, Jr., et al.*, Tulare County Superior Court, 2006

**250.** Consultant (P), Police Practices (Homicide Investigation, Jail Informants), *Thomas Goldstein v. City of Long Beach, et al.*, United States District Court, Central District of California, 2006

**251.** Consultant (P), Police Practices (Patrol Procedures, Use of Deadly Force), *Gustavo Pena v. City of Stockton, et al.*, San Joaquin County, 2006

**252.** Consultant (P), Security Practices (Eviction, Use of Force, Reporting), *Zuniga, et al. v. Ventura Productions LLC, et al.*, Tulare County Superior Court, 2006

**253.** Consultant/Expert (P), Police Practices (Public Intoxication, Patrol Procedures, Use of Force, Reporting), *People v. Brian & Lucy Baker*, San Diego County Superior Court, 2006, Plea Bargain

**254.** Consultant/Expert (D), Police Practices (Child Abduction, Probable Cause), *Ventura, et al. v. City of Selma, et al.*, Fresno County Superior Court, 2006, Settlement

**255.** Consultant/Expert (D), Police Practices (Homicide Investigation), *Zimmerman v. City of Eau Claire,* ▓▓▓▓▓▓▓ *et al.*, United States District Court, Western District of WISCONSIN, 2006, MSJ Granted

40

**256.** Consultant (D), Police Practices (Mentally Disabled Persons, Use of Deadly Force), *Estate of Daniel Bennett v. Oxford County,* ████, *et al.*, Oxford County Superior Court, Western District of MAINE, 2006

**257.** Consultant (P), Security Practices (OLCC Licensed Premises, Inadequate Security, Security Procedures, Security Reporting), *Estate of Aaron Crews v. Lucky U, et al.*, Multnomah County Superior Court, Portland, ████, 2006

258. Consultant (D), Police Practices (Arrest Procedures, Use of Force), *People v. Travis Doyle Adams*, Circuit Court of ████ for Umatilla County, 2006

## PUBLICATIONS

"Recruitment, Selection, and Training in the Long Beach Police Department," Deputy Chief David A. Dusenbury, Journal of California Law Enforcement, Volume 22, No. 3, October 1988.

"A Systems Approach to Goals and Objectives," D. A. Dusenbury and K. M. Shelley, California Peace Officer, September 1991.

## EMPLOYMENT

**DAVID A. DUSENBURY & ASSOCIATES** 1994-Present
Police/Security Consultants/Experts
Long Beach, California

**AMERICAN PROTECTIVE SERVICES** 1997-1998
Los Angeles, California

Assistant Branch Manager. Responsible for the supervision and management of approximately 575 personnel Supervised account managers, project managers and site supervisors. Responsible for contract security at high-rise building accounts in central, mid-Wilshire and, Century City areas of Los Angeles. Conducted "Security Vulnerability Surveys". Trained new security officers on the law (Classroom Basic Training).

**AMERICAN PROTECTIVE SERVICES** 1995-1997
Long Beach, California

Assistant Branch Manager. Responsible for the supervision and management of approximately 475 personnel. Management of field supervision, payroll, personnel, scheduling, petro-chemical and high-rise building accounts. Conducted "Security Vulnerability Surveys". Trained new security officers on the law (Classroom Basic Training).

**AMERICAN PROTECTIVE SERVICES** 1991-1995
Los Angeles, California

41

Assistant Branch Manager. Responsible for the supervision and management of approximately 575 personnel Supervision of 4 account managers, 6 project managers and 13 site supervisors assigned to the high-rise Division. Responsible for 19 high-rise building accounts: in the central, mid-Wilshire, and Century City areas, of Los Angeles. Conducted "Security Vulnerability Surveys". Trained new security officers on the law (Classroom Basic Training).

LONG BEACH POLICE DEPARTMENT (Service Retirement - 30 Years)        1968-1991
    Long Beach, California

DEPUTY CHIEF OF POLICE - July 28, 1990 to December 31, 1991

|  |  |
|---|---|
| Assignment: | Support Bureau |
| Staff: | 364 |
| Budget: | $22,747,000 |

Management of Budget, Communications, Food Services, Jail, Records, and *Traffic Divisions*. Activities of Bureau included management of department budget ($91,257,000); processing, housing and feeding of 36,000 prisoners annually. Traffic Division consisted of 30 motorcycle officers, an Accident Investigation Detail, Parking Enforcement Officers, a Commercial Enforcement Unit, and a School Crossing Guards Unit. NCCJ Board of Directors, Long Beach Chapter. Developed policies and procedures for a new division (Food Services, formerly within the Jail Division), reducing costs by 10%. **Conducted "Use of Force Study" for the Chief of Police, surveying 14 California police departments, including Sacramento, San Diego, San Francisco, San Jose, and Oakland. Study encompassed examination of policies and procedures relative to the use of force; receipt of citizen complaints; the role of first-line supervision in the investigation of citizen complaints; the reporting and investigation of use of force; and the control and supervision of police pursuits.**
DEPUTY CHIEF OF POLICE - January 16, 1988 to July 27, 1990

|  |  |
|---|---|
| Assignment: | Detective Bureau |
| Staff: | 195 |
| Budget: | $14,569,000 |

Management of Detective, Juvenile, and Special Investigations (Crime Suppression, Drug Investigations, Vice Investigations) Divisions. Activities of bureau included all follow-up investigations (except traffic), Crime Analysis, Crime Laboratory, and Major Violators Unit. Supplemented an existing Managing Criminal Investigations (MCI) component with an assigned case priority system. Managed the Career Criminal Apprehension Program (Crime Analysis) and Property Crimes Grants. Developed the Investigator Training Program. Expanded the Drug Abuse Resistance Education (D.A.R.E.) Program to the middle schools. Consolidated the processing of local permits and Alcoholic Beverage Control licensing. **Directed and supervised the revision of Shooting, In-Custody Death and Use of Force Review Boards policies and procedures. Reduced the number of "out of policy" shootings through more stringent review of "officer involved shootings". Chaired these boards and made disciplinary and training recommendations to the Chief of Police.** Conducted "Skelly" (administrative appeal) hearings.

DEPUTY CHIEF OF POLICE - May 24, 1986 to January 15, 1988

42

Assignment: Executive Operations Bureau
Staff: 44
Budget: $3,200,000

Management of Community Relations, Gang Unit, Intelligence, Internal Affairs, Police Officer / Reserve Officer Recruitment. Expanded Neighborhood Watch Program participation by 50%. Enhanced credibility of the Internal Affairs Section by re-assignment and re-organization. Revised police officer selection process/improved affirmative action hiring, achieving a 40% ratio through intensive recruitment of minorities. **Developed an "ethics" training program for all department personnel.**

POLICE COMMANDER - February 16, 1985 to May 23, 1986

Assignment: Criminal Investigations Division
Staff: 127
Budget: $7,703,000

**Management of adult criminal and juvenile investigations; the collection and preservation of criminal evidence and criminalistics laboratory functions.** Directed re-assessment of division structure, equipment and personnel; instituted appropriate changes. Member of Los Angeles County Coordinating Committee for establishing the Los Angeles County Regional Automated Fingerprint Identification System. Instituted changes which resulted in substantial savings to the City of Long Beach and other independent cities. Member of the Security Subcommittee-Fire/Life Safety Committee for the Long Beach-Los Angeles Light Rail Project.

POLICE LIEUTENANT - November 28, 1981 to February 15, 1985.

Assignment: Vice Investigations Section
Staff: 14
Budget: $1,000,000

Management of prostitution, lewd conduct, bookmaking (supervision, preparation and execution of search warrants), gambling, *alcoholic beverage control law enforcement, and enforcement of various local ordinance laws.* Responsible for the re-examination of bingo law enforcement resulting in suspension and revocation of some permits. Instrumental in maintaining appropriate lewd conduct enforcement. Facilitated the appropriate re-assignment of some section personnel.

POLICE SERGEANT - February 1, 1976 to November 27, 1981

Assignments: **Records Division (Report Review- review of reports for completeness, compliance with policy and procedure, elements of crime, probable cause for arrest, investigative follow-up, etc.);** Patrol (Station Supervisor); Patrol (Field Supervisor). Supervised Reporting Office and Information Desk personnel. Acted as Station Commander on regular basis. **Patrol Bureau field supervisor on the Evening and Morning Watch Shifts.**

POLICE PATROLMAN - June 1, 1968 to January 31, 1976

43

Assignments: Patrol (Evening Watch, Mid-Watch, Morning Watch Shifts), Communications, Juvenile and Detectives (undercover enforcement unit targeting felony offenders; preparation and execution of search warrants).

LYNWOOD POLICE DEPARTMENT
Lynwood, California

POLICE OFFICER     - August 4, 1961 to May 31, 1968

Assignments: Patrol (2 years), *Traffic Officer (motorcycle) (3 years)*. On "Military Leave" for 2 years.

## MILITARY

U. S. ARMY                                                                                             1963-65

57th Military Police Company
United States Military Academy
West Point, New York

## MEMBERSHIPS

American Mensa Limited

American Philatelic Society
American Society for Industrial Security

Association of Certified Fraud Examiners – Associate Member

California Peace Officers' Association

California State University at Los Angles Alumni Association (Life Member)

International Association of Chiefs of Police

Stanford Athletics Buck Cardinal Club

\*\*\*\*\*

**My consultation/expert witness fee is $225.00 per hour for all case-related activities, including, but not necessarily limited to, review of reports and depositions, telephonic and in-person conferences, on-site inspections, investigation, travel time, etc. Trial testimony will be billed at $350.00 per hour, minimum of 4 hours. Deposition fees are to be paid by opposing counsel at the time of the deposition. THE HOURLY RATE FOR DEPOSITION TESTIMONY IS $350.00 PER HOUR, WITH A MINIMUM 4 HOURS. IF THE**

HOURS. IF THE DEPOSITION TAKES LESS THAN 4 HOURS, THE REMAINING HOURS
UNPAID BY OPPOSING COUNSEL WILL BE BILLED TO AND BE THE RESPONSIBILITY OF
RETAINING COUNSEL. Deposition testimony fees are to be made payable to "David A.
Dusenbury and Associates", regardless of who is the designated deponent. Trial testimony will
be billed at $350.00 per hour, minimum of 4 hours. Travel time to and from depositions
and court testimony will be billed at the $175.00 per hour. Court testimony beyond
100 miles will be billed as an 8-hour minimum per day; time beyond 8 hours will be
billed at the $350.00 hourly rate. Telephone, mail, and ground travel (within 50 miles)
costs are included in the hourly rate. Commercial transportation, hotel
accommodations, and meals will be billed separately, at actual cost.

Sincerely,

*David A. Dusenbury*
David A. Dusenbury